JOSEPH M. SCRIMMINGER, *ET AL.*, PLAINTIFFS-RE-
SPONDENTS, v. PAUL J. SHERWIN, SECRETARY OF
STATE OF THE STATE OF NEW JERSEY, AND APPOR-
TIONMENT COMMISSION OF THE STATE OF NEW
JERSEY, DEFENDANTS-APPELLANTS.

Argued February 8 and 14. 1972—Decided May 22, 1972.

*Mr. David J. Goldberg* and *Mr. William Miller,* Special Counsel, argued the cause for the Apportionment Commission.

*Mr. Hugo M. Pfaltz, Jr.,* argued the cause for the Speaker of the General Assembly of New Jersey (*Messrs. Bourne and Noll,* on the brief).

*Mr. Lawrence I. Lerner* argued the cause for respondents Scrimminger, *et al.* (*Mr. Richard I. Samuel,* on the brief).

*Mr. Franklin H. Berry, Jr.,* argued the cause for respondents Ocean County Board of Chosen Freeholders, *et al.* (*Messrs. Berry, Summerill, Rinck and Berry,* attorneys).

*Mr. Jeffrey G. Albertson* argued the cause for respondents McCaffrey, *et al.*

The opinion of the Court was delivered by

WEINTRAUB, C. J. This is our eleventh opinion dealing with apportionment under the one-man one-vote doctrine. Two related to the Congress, *Jones v. Falcey,* 48 *N. J.* 25 (1966); *Koziol v. Burkhardt,* 51 *N. J.* 412 (1968), and the others, as does this one, to the State Legislature, *Jackman*

v. *Bodine*, 43 *N. J.* 453 (1964); 43 *N. J.* 491 (1964); 44 *N. .J.* 312 (1965); 44 *N. J.* 414 (1965); 49 *N. J.* 406 (1967); 50 *N. J.* 127 (1967); 53 *N. J.* 585 (1969), *cert.* denied, 396 *U. S.* 822, 90 S. Ct. 63, 24 *L. Ed.* 2d 73 (1969); 55 *N. J.* 371 (1970), *cert.* denied, 400 *U. S.* 849, 91 S. Ct. 39, 27 *L. Ed.* 2d 87 (1970).

The apportionment here involved followed the 1970 census. The trial court found the deviations from mathematical equality were intolerable under the doctrine of *Reynolds v. Sims*, 377 *U. S.* 533, 84 S. Ct. 1362, 12 *L. Ed.* 2d 506 (1964). Because of practical considerations, see *Jackman*, 43 *N. J.* at 473–474, the trial court permitted the election scheduled for 1971 to proceed under the plan, but held that no further election may be had under it. We certified the ensuing appeals before argument in the Appellate Division. The decision to permit the 1971 election to proceed is not challenged.

I

Our State Constitution provides for a Senate of 40 members and a General Assembly of 80 members. *Art.* 4, § II, ¶¶ 1 and 3. The election districts are to be established by an Apportionment Commission after every decennial census of the United States. *Art.* 4, § III, ¶ 1. The Constitution directs the Commission to proceed as follows:

1. The 40 Senators shall be apportioned among Senate districts "as nearly as may be according to the number of their inhabitants as reported in the last preceding decennial census of the United States and according to the method of equal proportions." *Art.* 4, § II, ¶ 1.

2. "Each Senate district shall be composed, wherever practicable, of one single county, and, if not so practicable, of two or more contiguous whole counties." *Art.* 4, § II, ¶ 1.

3. Each Senator shall be elected by the voters of the Senate district, but "if the Senate district is composed of two

or more counties and two senators are apportioned to the district, one senator shall be elected by the legally qualified voters of each Assembly district." *Art.* 4, § II, ¶ 2.

4. With respect to the election of Assemblymen, the Constitution provides that if only one Senator is to be elected from a Senate district, that district will also constitute an Assembly district, and if more than one Senator is to be elected from a Senate district, then that district shall be divided into as many Assembly districts as there are Senators apportioned to that Senate district. *Art.* 4, § II, ¶ 3. Two Assemblymen shall be elected from each Assembly district. *Art.* 4, § II, ¶ 4. Finally the Constitution directs in *Art.* 4, § II, ¶ 3 that:

> * * * The Assembly districts shall be composed of contiguous territory, as nearly compact and equal in the number of their inhabitants as possible, and in no event shall each such district contain less than eighty per cent nor more than one hundred twenty per cent of one-fortieth of the total number of inhabitants of the State as reported in the last preceding decennial census of the United States. Unless necessary to meet the foregoing requirements, no county or municipality shall be divided among Assembly districts unless it shall contain more than one-fortieth of the total number of inhabitants of the state, and no county or municipality shall be divided among a number of Assembly districts larger than one plus the whole number obtained by dividing the number of inhabitants in the county or municipality by one-fortieth of the total number of inhabitants of the State.

We emphasize some aspects of the foregoing constitutional plan. A central concept is that the Senate districts shall consist of whole counties, and of only one whole county if practicable. The Senators are to be elected by the whole Senate district with this exception, that if *two* Senators are to be elected from a *multi-county* Senate district, each Senator shall be elected from a constituent *Assembly district*. As we have construed the Constitution, the theme of that exception also applies if *more than two* Senators are to be elected from a *multi-county* Senate district, so that the candidates must run in *Assembly districts,* rather than at large in the Senate district. *Jackman,* 49 *N. J.* at 416.

Hence there are diversities with respect to the representation of whole counties in the Senate. If a whole county constitutes a Senate district entitled to one Senator, the voters of that county of course will elect him. If a whole county constitutes a Senate district entitled to more than one Senator, all the voters of the county elect all of the Senators. But if any county, whether it would be entitled by population to one or to more than one Senator if it were a separate district, is joined with one or more counties to constitute a district, then the Senators will be severally elected within Assembly districts, which may consist of either a part of one county or parts of more than one county.

We add that although the plan contemplates that Assemblymen will be apportioned among the Senate districts on the basis of two Assemblymen for every Senator, we concluded that to do so would compound any population deviation involved in the apportionment of the 40 Senators among Senate districts, and we therefore held the 80 Assemblymen must be apportioned among the Senate districts on the equal proportions method. *Jackman,* 49 *N. J.* at 416–417. As a result, an odd number of Assemblymen may be allocated to the Senate districts notwithstanding the State Constitution's theme that the Assemblymen be apportioned to Senate districts on the basis of two for each Senator. Accordingly some Assemblymen have run at large within a Senate district.

The command for adherence to county lines generates the issue before us. The difficulty stems from the circumstance that there are but 21 counties with substantial differences in population. For that reason, the counties, under the present distribution of the State's population, cannot constitute separate districts. Nor are they suitable building blocks for the formation of meaningful districts. The 1970 census figures available to the Commission[1] attributed to New Jer-

---

[1] After the Apportionment Commission certified its plan, the published official 1970 census fixed the population at 7,168,164, and this was later corrected to 7,170,885. The adjustments are of no moment for the purpose of this case.

sey a population of 7,170,634, so that the ideal population per Senator was 179,266. The task of the Commission was to apportion the 40 Senators among counties with the following populations:

| | | | |
|---|---|---|---|
| Cape May | 59,554 | Burlington | 323,132 |
| Salem | 60,346 | Morris | 383,454 |
| Hunterdon | 69,718 | Camden | 456,291 |
| Warren | 73,879 | Passaic | 460,782 |
| Sussex | 77,528 | Monmouth | 461,849 |
| Cumberland | 121,374 | Union | 543,116 |
| Gloucester | 172,681 | Middlesex | 583,813 |
| Atlantic | 175,043 | Hudson | 609-266 |
| Somerset | 198,372 | Bergen | 898,012 |
| Ocean | 208,470 | Essex | 929,986 |
| Mercer | 303,968 | | |

The Apportionment Commission noted that the Constitution's mandate for apportionment of 40 Senators among Senate districts "as nearly as may be according to the number of their inhabitants" conflicts with the further mandate that "Each Senate district shall be composed, wherever practicable, of one single county, and, if not so practicable, of two or more whole counties." This is so because greater population equality can be achieved as more counties are joined into fewer Senate districts but that process necessarily reduces the number of counties standing alone as Senate districts. The Commission tried to strike a balance between those mandates. It created 15 Senate districts, of which 10 counties constituted separate districts, with the following consequences. Of those 10 counties, two elect one Senator each; one elects two Senators; five elect three; and two elect five. If any of those 10 counties had been made a part of a larger district, that county would not have been able to elect a Senator at large, for the candidates would have to run within subdistricts, i. e., the Assembly districts. As to the five districts the Commission created by joining two or more of the remaining 11 counties, four districts consist of two counties while the remaining district consists of

three counties. As to the two-county districts, two districts are allotted one Senator, one is allotted two Senators, and the other is allotted three Senators. The three-county district is allotted four Senators.

In terms of deviations from ideal representation, the results are these:

| | |
|---|---|
| *Senate Districts* | |
| Maximum % above Ideal | +13.29% |
| Maximum % below Ideal | −15.54% |
| Range of Deviations | 28.83% |
| Population Ratio | 1:1.34 |
| *Assembly Districts* | |
| Maximum % above Ideal | +10.66% |
| Maximum % below Ideal | −15.54% |
| Range of Deviations | 26.20% |
| Population Ratio | 1:1.31 |

It will be noted that the population ratios of 1:1.34 and 1:1.31 are within the limit of 1:1.5 set forth in the State Constitution's provision that no Assembly district shall contain less than 80% nor more than 120% of one-fortieth of the total number of inhabitants (*Art.* 4, § II, ¶ 3), but for the reasons which follow it is now plain that this limit in our State Constitution exceeds what the Federal Constitution permits.

## II

One-man one-vote reflects an ideal that every man's vote should equal another's. The ideal is unattainable because that equality could be had only in an election at large — here statewide — and an election at large would be undesirable because it would deny other democratic values. This is so because in such a contest the winner may take all, and this would foreclose the value of check and dissent. Further, important interests might have no spokesmen. Then, too, voting would be blind, since voters could not know enough about so many candidates. For those reasons it is better, and compatible with the equal protection clause, to

apportion the power to elect among clusters of citizens. Those clusters however are constituted solely on the basis of geography, and when that is done, a man's vote is no longer assured equality at large. The value of the vote of a member of a statewide majority may then be nullified if he is of the minority in the geographic district in which he must vote, or his vote may be enhanced or diminished in relation to a vote in another district depending upon the percentages of voter eligibility, voter registration, and voter indifference on election day in the respective districts. *Jackman,* 43 *N. J.* at 465–466.

Thus election by districts necessarily departs from the ideal of equality among voters. More than that, districting enables the creator of the districts to draw lines to his own advantage. The question, in that light, is whether deviations from population equality among districts should be tolerated either to advance the objective of districting or to restrain the opportunities for partisan advantage which districting itself generates.

In *Jackman,* 53 *N. J.* 585, we sustained the 1969 apportionment for the purpose of the then impending election, but we doubted that the basic plan for districting contained in our State Constitution could be upheld with respect to elections thereafter. We therefore ordered additional argument as to the validity of the provisions of the State Constitution. After that further argument, we upheld the Constitution's plan. *Jackman,* 55 *N. J.* 371. In doing so, we summarized our understanding of the then controlling decisions this way (*pp.* 378–380) :

*Reynolds v. Sims* said there may be departures from mathematical equality in drawing district lines in order to maintain the integrity of political subdivisions because (1) adherence to such political lines may deter gerrymandering and (2) local governmental entities are frequently charged with various responsibilities incident to the operation of state government, and hence it is appropriate to provide a voice for that political community. After we held in *Jackman, supra,* 43 *N. J.* 453, that the Senate was malapportioned under *Reynolds v. Sims,* the State Constitution was amended. The plan

thereby adopted calls for adherence to county and municipal lines in the formation of districts. *Art.* IV, § II, *pars.* 1–3.

In *Jackman, supra,* 53 *N. J.* 585, we concluded that *Reynolds v. Sims* was not undercut in this respect by *Kirkpatrick v. Preisler,* 394 *U. S.* 526, 89 *S. Ct.* 1225, 22 *L. Ed.* 2d 519 (1969), and *Wells v. Rockefeller,* 394 *U. S.* 542, 89 *S. Ct.* 1234, 22 *L. Ed.* 2d 535 (1969). Those cases did raise doubt as to whether adhering to existing political subdivision lines could justify a population deviation, but they dealt with congressional districting whereas *Reynolds v. Sims* dealt with apportionment of a state legislature. There are differences, as well as similarities, between districting for federal and districting for state purposes.

As to gerrymandering, the problem, it is true, is present both in congressional districting and in state legislative districting, but the opportunities are for more numerous with respect to elections to the state legislature. Nor will the computer likely be of aid if political subdivision lines are ignored. Computer-made plans, all mathematically perfect and doubtless numbering in the thousands, will still be keyed to instructions the computer itself cannot supply. Of course the use of existing county and municipal lines does not foreclose partisan selection of district lines, but it does limit that opportunity and does tend to make the political party responsible for the district plan more readily accountable at the polls.

And with respect to the relationship between political entities and the legislative process, we recognize that today the county and the municipality are no longer strangers to federal legislation. Nonetheless the county and the municipality are the meaningful units in state-local relations in many more situations, and elections from districts are the more worthwhile if the county and the municipality are reflected in drawing the district lines.

For these reasons, we concluded in *Jackman v. Bodine, supra,* 53 *N. J.* at 587-588, that *Kirkpatrick* and *Wells* did not undermine the holding of *Reynolds* that the use of existing political subdivisions may justify a deviation from mathematical equality in state legislative districting.

It is insisted that the deviations from the mathematical equality in the case now before us are close to the deviations in the 1969 plan involved in *Jackman,* 53 *N. J.* 585. In fact we did not there hold the 1969 plan to be valid. Rather, subject to certain modifications of the plan which the opinion directed, we permitted the election to proceed out of necessity, expressly reserving the question whether the State Constitution's plan was inherently incompatible with the Federal Constitution. And in *Jackman,* 55 *N. J.* 371, we considered "only the face of the plan [of the Constitution] and what its terms

might permit," 55 *N. J.* at 375, although it must be conceded that under the views there expressed, the range of deviations under the 1969 plan would not have been intolerable as a matter of law. At any rate, decisions of the United States Supreme Court since then persuasively show that such deviations cannot be upheld and indeed that our Constitution's mandate for adherence to county lines cannot be followed under the present population distribution in our State.

As the excerpt just quoted from *Jackman,* 55 *N. J.* at 378-380, reveals, we have acted upon the assumption that adherence to the lines of political subdivisions will justify a greater deviation from mathematical equality in the case of elections for the State legislature than in the case of an election for the Congress. We think that assumption remains viable, even if suspect. In *Connor v. Williams,* 404 *U. S.* 549, 92 S. Ct. 656, 30 *L. Ed.* 2d 704 (1972), the Court said of *Preisler* and *Wells* that "These decisions do not squarely control the instant appeal since they do not concern state legislative apportionment, but they do raise substantial questions concerning the constitutionality of the District Court's plan as a design for permanent apportionment." 404 *U. S.* at 550, 92 S. Ct. at 658, 30 *L. Ed.* 2d at 706. The Court added that "If we are to consider the applicability of *Preisler* and *Wells* to state legislative districts, it would be preferable to have before us a final judgment with respect to the entire State." 404 *U. S.* at 551, 92 S. Ct. at 658, 30 *L. Ed.* 2d at 707.

*Connor v. Williams* involved a court-made plan. The plan devised for the State legislature contained a total variance of 18.9% between the largest and smallest Senate districts and of 19.7% between the largest and smallest House districts. These variances of course are smaller than those now before us (28.83% as to the Senate and 26.20% as to the General Assembly). The Supreme Court did not decide whether the amount of deviation in the court-made plan was inherently indefensible. The Supreme Court concluded that an election already held should not be upset, and this because of the necessity that there be government. But it is significant

that the deviations were not approved. And the statement that *Preisler* and *Wells,* which struck down total variances of 5.97% and 13.1%, "raise substantial questions" concerning the constitutionality of the plan before the Court, suggests strongly that the deviations before us could not pass muster. Indeed other decisions of the United States Supreme Court make that conclusion inescapable.

We refer to *Whitcomb v. Chavis,* 403 *U. S.* 124, 91 S. Ct. 1858, 29 *L. Ed.* 2d 363 (1971), and *Abate v. Mundt,* 403 *U. S.* 182, 91 S. Ct. 1904, 29 *L. Ed.* 2d 399 (1971).

*Whitcomb* involved the apportionment of the legislature of Indiana. The Supreme Court affirmed the lower court's determination that the apportionment plan, which we understand followed a policy of adhering to county lines, was invalid. Mr. Justice White speaking for himself and three other Justices, but with the concurrence in this respect of three dissenting Justices, 403 *U. S.* at 179, 91 S. Ct. at 1888, 29 *L. Ed.* 2d at 397–398, said, 403 *U. S.* at 161, 91 S. Ct. at 1878, 29 *L. Ed.* 2d at 386–387:

* * * This evidence, based on 1960 census figures, showed that Senate district 20, with one senator for 80,496, was overrepresented by 13.68% while district 5, with one senator for 106,790, was underrepresented by 14.52%, for a total variance of 28.20% and a ratio between the largest and smallest districts of 1.327 to 1. The house figures were similar. The variation ranged from one representative for 41,449 in district 39 to one for 53,003 in district 35, for a variance of 24.78% and a ratio of 1.279 to 1. These variations were in excess of, or very nearly equal to, the variation of 25.65% and the ratio of 1.30 to 1 which we held excessive for state legislatures in *Swann v. Adams,* 385 *U. S.* 440, 87 S. Ct. 569, 17 L. Ed. 2d 501 (1967). Even with this convincing showing of malapportionment, the court refrained from action in order to allow the Indiana Legislature to call a special session for the purpose of redistricting.

We read *Whitcomb* to mean that such deviations are invalid notwithstanding the stated purpose of the apportionment (*i. e.,* to adhere to county lines), and even though that purpose could not be satisfied by another arrangement involving lesser deviations. We note that heretofore we did not

read *Swann v. Adams* (or *Kilgarlin v. Hill*, 386 *U. S.* 120, 87 S. Ct. 820, 17 *L. Ed.* 2d 771 (1967), which disapproved a total variance of 26.48 and a ratio of 1.31 to 1) to say such deviations were inherently intolerable. Rather we read those cases to turn upon the circumstance that no explanation of the deviations was offered. *Jackman, supra,* 55 *N. J.* at 381–382. *Whitcomb* however appears to say that *Swann* struck down the deviation as necessarily unjustifiable.

*Abate* involved county government. The plan, under which the board of supervisors was apportioned among the constituent towns, resulted in variations of $+7.1\%$ to $-4.8\%$, for a total deviation of 11.9%. The Court held that the need for flexibility, the desire to preserve the integrity of political subdivisions, and the limited number of the representatives involved "lend support to the argument that slightly greater percentage deviations may be tolerable for local government apportionment schemes" than in the case of their State or national counterparts. 403 *U. S.* at 185, 91 S. Ct. at 1907, 29 *L. Ed.* 2d at 402–403. Thus approaching the case, the majority upheld the plan but added (403 *U. S.* at 187, 91 S. Ct. at 1908, 29 *L. Ed.* 2d at 403–404):

> We emphasize that our decision is based on the long tradition of overlapping function and dual personnel in Rockland County government and on the fact that the plan before us does not contain a built in bias tending to favor particular political interests or geographic areas. And nothing we say today should be taken to imply that even these factors could justify substantially greater deviations from population equality.

Two dissenters found the deviations to be unjustifiable, citing in support *Preisler* and *Wells,* which dealt with congressional districting. *Abate* leaves the reader with the conviction that the deviations it upheld are about the maximum permissible for county government, with something considerably less being the most that adherence to the lines of political subdivisions could justify in the case of a State legislature.

 We therefore conclude that the apportionment plan before us is invalid and that another plan must be drawn for the next election in 1973.

### III

This brings us to the question whether the mandate of our State Constitution with respect to adherence to county lines can be enforced under the demographic pattern revealed by the 1970 census. We are satisfied it cannot, and this upon several considerations.

The first is that the supposed justification for adhering to county lines cannnot be realized. The principal justification for the deviations is the public advantage gained by assuring each county a separate voice in its relations with the State. That objective is not achieved in the present plan since only 10 of the 21 counties are represented by Senators elected by the voters of the county. The result is that the counties are dealt with unequally in what, by hypothesis, is an important aspect of the legislative scene. And failure to achieve that objective will become more pronounced and the treatment of the counties more disparate with every effort to reduce the range of deviation, for as we noted earlier, greater population equality can be achieved only if the number of Senate districts is reduced, and as more counties are thus combined to achieve smaller deviations, the fewer will be the counties which will have their own representatives in the Senate.[2] Thus the smaller the deviation, the smaller will be the justification for any deviation at all.

The second consideration militating against the value of adhering to county lines is the phenomenon of the multi-member district. Of the 10 counties which severally elect their Senators, eight elect between two and five Senators at

---

[2] The Apportionment Commission considered only plans with 10 or more Senate districts. In the 10-district plans there were no more than three single-county districts. The lowest range of deviation achieved on any of those plans was 7.90%.

large rather than within sub-senate districts. Thus 8 of the 21 counties have multiple voices in the Senate. This raises the troublesome problem of multi-member districts, discussed at length in *Whitcomb v. Chavis,* 403 *U. S.* at 142–149, 91 S. Ct. at 1868–1872, 29 *L. Ed.* 2d at 375–379. Opponents of the multi-member district contend that each voter in such a district has the edge over a voter in a single-member district in that he has the chance of casting the decisive vote with respect to the election to each office to be filled whereas the voter in a single-member district can hope to do so only as to one office. That chance is too remote mathematically to be exciting, but there seems to be substance to the claim that the voters of a multi-member county have a larger influence in the Senate by virtue of multi-representation. If this is correct, then our Constitution's plan induces this further element of inequality in its insistence upon adherence to the county as the election district.

Furthermore, a multi-member election means that the winner may take all. That result does not clash with the one-man one-vote ideal since, as we have said, at-large elections advance voter equality, but there is a clash with the overriding concept that representative government calls for elections by clusters of population to the end that sundry interests may thereby be heard. Members of a minority group may well feel they will fare better when the population clusters are smaller, notwithstanding the political reality that a substantial minority group is not ignored when a multi-member slate is assembled. Although *Whitcomb v. Chavis* refused to hold that the multi-member district is necessarily invalid, nonetheless the Supreme Court said four days earlier that "We agree that when district courts are forced to fashion apportionment plans, single-member districts are preferable to large multi-member districts as a general matter." *Connor v. Johnson,* 402 *U. S.* 690, 692, 91 S. Ct. 1760, 1762, 29 *L. Ed.* 2d 268, 271 (1971). This was repeated in *Connor v. Williams, supra,* 404 *U. S.* at 551, 92 S. Ct. at 658, 30 *L. Ed.* 2d at 707. We of course are not discussing the constitution-

ality of the multi-member district. We are speaking only of the element of inequality among voters which may ensue when only some of the Senators are elected on a multi-member basis, and we speak of this subject only to the extent that it relates to the larger question whether population deviations among districts is made worthwhile because of advantages thought to inhere in the preservation of the county in drawing district lines.

For these reasons, the use of county lines under the present distribution of population in our State yields little to compensate for the deviations it produces among Senate districts. And we repeat, the supposed advantage will shrink even more if more counties are combined as they must be to reach a tolerable range of deviation. Moreover if the county is ignored in drawing district lines, its interests will not go unrepresented. A Senator must be mindful of the interests of the county or counties in which his constituents live. True, there may be exceptional situations in which there are conflicting interests within a county, but when that is so, something may well be gained by letting those diverse interests have independent voices through Senators elected in smaller one-man districts. And finally the use of one-man Senate districts would obviate the present problem of the odd number of Assemblymen, for the deviations among one-man Senate districts should be so small as to permit realization of the intent of the Constitution that two Assemblymen shall be allotted per Senator.

█ We therefore must conclude that the mandate in the State Constitution for recognition of county lines will not justify any deviation under the demographic pattern of the 1970 census. Since the county cannot now serve as the basis of districting and since the multi-member district is contemplated in the Constitution only as an incident of county representation, it follows that the Senate districts to be created without reference to counties must be single-member districts. Municipal lines should be observed, if possible, for if they are followed, dividends may be expected in terms of

furthering the relationship of these political subdivisions and the State and also in terms of restraining to some extent the opportunities for drawing lines for partisan advantage. Municipalities are thus appropriate building blocks for the creation of districts. The boundaries of the larger municipalities will of course have to be breached, and in this regard, the Commission may have to depart from the direction in *Art.* 4, § II, ¶ 3, concerning the division of a municipality. The requirement for contiguity will obtain. So also will the requirement for compactness, which may serve to justify a deviation or to curb the quest for partisan gain, although, as we have noted before, compactness may be of limited utility in the light of the odd configurations of our State and its municipalities. *Jackman,* 49 *N. J.* at 419. We of course cannot predict what range of deviation will be bad *per se.* We repeat, however, that there is no range of deviation within which a State may maneuver with or without reason. The constitutional command is to achieve equality, and hence a deviation may not exceed what an acceptable thesis of apportionment inevitably requires. *Jones v. Falcey, supra,* 48 *N. J.* at 37. The subject matter is returned to the Apportionment Commission for the preparation of another plan.

Subject to the foregoing views, the judgment of the trial court is affirmed.

*For modification*—Chief Justice WEINTRAUB and Justices JACOBS, FRANCIS, PROCTOR, HALL, SCHETTINO and MOUNTAIN—7.

*Opposed*—None.