124 N.J. Super. 30 (1973)
304 A.2d 736
FRANK DAVENPORT, ET AL., PLAINTIFFS-APPELLANTS,
v.
APPORTIONMENT COMMISSION OF THE STATE OF NEW JERSEY AND ROBERT M. FALCEY, ACTING SECRETARY OF THE STATE OF NEW JERSEY, DEFENDANTS-RESPONDENTS.
Superior Court of New Jersey, Appellate Division.
Argued April 30, 1973.
Decided May 3, 1973.
*33 Before Judges CARTON, MINTZ and SEIDMAN.
Mr. Henry Ramer argued the cause for appellants Frank Davenport, A. Michael Rubin and Walter J. Price.
Mr. Alfred J. Lechner, Jr. argued the cause for appellant Christopher Dietz.
*34 Mr. Donald L. Berlin argued the cause for appellants Dorothea Hummel, Elaine Obenhuber, Nancy Knapp, Lois Keitel, John C. Rice, Virginia K. Rooney, Katherine Roberts, Donald L. Berlin, Gray Gromleigh, Rose Brady, Lawrence Brown, Joseph Filiberto, Barbara Ali and Alex DeCroce (Messrs. Lieb, Teich & Berlin, attorneys).
Mr. Walter F. Hoffman argued the cause on behalf of Amicus Curiae John Mazzacca.
Mr. William Miller and Mr. David J. Goldberg argued the cause for respondent Apportionment Commission of New Jersey.
Mrs. Joyce Usiskin, Deputy Attorney General, argued the cause for respondent Robert F. Falcey, Acting Secretary of State (Mr. George F. Kugler, Jr., Attorney General of New Jersey, attorney; Mr. Stephen Skillman, Assistant Attorney General, of counsel).
The opinion of the court was delivered by CARTON, P.J.A.D.
This is the latest in a decade-long series of legislative apportionment cases considered by the courts of this State. Plaintiffs, residents of various municipalities in Union, Morris and Passaic Counties, challenge the districting plan certified on March 15, 1973 by the Apportionment Commission pursuant to N.J. Const. (1947), Article IV, § III, for state legislative elections this year and the remaining odd-numbered years of this decade. The gist of their respective complaints is that the Commission placed the municipalities in which they reside in districts consisting substantially of municipalities in another county or counties and that their ability as residents of their respective counties to maintain a strong voice in the State Legislature concerning matters of county interest has thereby been greatly diminished. The court below consolidated the various actions, conducted a hearing on them and dismissed *35 the complaints, refusing to stay the approaching primary election. However, the trial judge did order the separation of the Borough of Tuckerton from District 9 with which it was not contiguous and directed its inclusion in District 2. That determination was not appealed. Our Supreme Court denied certification.
At the outset we should say that we agree that district lines as approved by the court below should not be disturbed for this year's elections. The overriding objective in reapportionment must still be substantial equality of population among the various districts so that the vote of any citizen is approximately equal to that of any other citizen in the State. See Mahan v. Howell, 410 U.S. 315 at 322, and 325, 93 S.Ct. 979 at 984 and 985, 35 L.Ed.2d 320, at 329 and 331 (1973). The present plan with its maximum populations deviations from the ideal "one-man, one-vote" district of +2.854% and -1.389% satisfies that objective. Furthermore, in awarding or withholding immediate relief in a reapportionment case, the court should consider the proximity of the forthcoming election and the mechanics and complexities of state election laws. A court can reasonably endeavor to avoid a disruption of the election process which might result from requiring precipitate changes that could make unreasonable or embarrassing demands on a state in adjusting the requirement of the court's decrees. Reynolds v. Sims, 377 U.S. 533, 585, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964); Mahan v. Howell, supra, 410 U.S. at 330, 93 S.Ct. at 988, 35 L.Ed.2d at 334. With somewhat less severe time restrictions that this court now faces, our Supreme Court has declined to award immediately relief even where the complaint has had merit. See Jackman v. Bodine, 53 N.J. 585 (1969); Jackman v. Bodine, 49 N.J. 406 (1967); Jackman v. Bodine, 44 N.J. 312 (1965).
Our decision not to disrupt this year's election process does not mean that we approve the Apportionment Commission's districting plan now before us. As we point out later, on the basis of the record before us we have grave doubts as *36 to whether the plan complies completely as it should with state constitutional requirements.
A brief history of the reapportionment controversy will serve to provide a background for considering the specific respects in which the plan may be defective. In Baker v. Carr, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962), the United States Supreme Court held that the apportionment of seats in a state legislature may be a justiciable question. In the wake of that decision, an attack was launched on this State's system of legislative representation under the 1947 (and 1844) Constitution  one senator allotted to each county and 60 assemblymen apportioned among the counties on the basis of population, but with each county receiving at least one. The trial court in Jackman v. Bodine, 78 N.J. Super. 414 (Ch. Div. 1963), ruled that Baker v. Carr, supra, permitted apportionment on other than a "one-man, one-vote" basis when that basis was a rational one. It concluded that a system of equal representation for counties of unequal population was rational. The ensuing appeal was certified by our Supreme Court and the decision withheld until the publication of the landmark opinion of Reynolds v. Sims, supra.
Reynolds held that both houses of a bicameral state legislature must be apportioned on a population basis. 377 U.S. at 568, 84 S.Ct. 1362. Consequently, our Supreme Court declared the allocation of one state senator per county to be unconstitutional. The court enjoined further elections under the 1947 Constitution and suggested that the Legislature adopt an interim plan consonant with the opinion and call a Constitutional Convention. Jackman v. Bodine, 43 N.J. 453 (1964).
Subsequently a legislative resolution attempting to retain the structure of the Senate but providing for weighted voting was declared a nullity, Jackman v. Bodine, 43 N.J. 491 (1964), and an application for one more election under the then existing structure was denied, Jackman v. Bodine, 44 N.J. 312 (1965).
*37 In 1965 the Legislature adopted L. 1965, c. 19 (N.J.S.A. 52:10B-1 et seq.) which retained the method of apportioning members of the Assembly but enlarged the Senate to 29 members and created new senatorial districts. Each of these 14 new districts was composed of one or more whole counties and each was entitled to from one to four senators, depending on relative population. N.J.S.A. 52:10B-4. Our Supreme Court approved this interim plan in Jackman v. Bodine, 44 N.J. 414 (1965).
A Constitutional Convention met in 1966 and rewrote those sections of Article IV of the 1947 Constitution concerning the composition of the Legislature. The voters of the State ratified the proposed amendments in the general election of that year. The new Senate consisted of 40 members, the General Assembly of 80. The amendments provided for apportionment of the 40 members among Senate districts "as nearly as may be according to the number of their inhabitants," but each Senate district was required to be composed, "wherever practicable, of one single county, and, if not so practicable, of two or more contiguous whole counties." N.J. Const. (1947) Art. IV, § II, par. 1. In the case of a Senate district composed of two or more counties with two senators apportioned to the district, the senators were required to run singly in Assembly districts N.J. Const. (1947), Art. IV, § II, par. 2.
The amendments directed that each Senate district be divided into Assembly districts equal in number to the number of Senators apportioned to the Senate district, with two assemblymen to be elected from each Assembly district. The amendments detailed guidelines for the drawing of Assembly district lines:
* * * The Assembly districts shall be composed of contiguous territory, as nearly compact and equal in the number of their inhabitants as possible, and in no event shall each such district contain less than eighty per cent nor more than one hundred twenty per cent of one-fortieth of the total number of inhabitants of the State as reported in the last preceding decennial census of the United States. Unless *38 necessary to meet the foregoing requirements, no county or municipality shall be divided among Assembly districts unless it shall contain more than one-fortieth of the total number of inhabitants of the state, and no county or municipality shall be divided among a number of Assembly districts larger than one plus the whole number obtained by dividing the number of inhabitants in the county or municipality by one-fortieth of the total number of inhabitants of the State. [N.J. Const. (1947), Art. IV, § II, par. 3]
The new constitutional provisions provided that the legislative district lines be drawn by an Apportionment Commission consisting of ten members, five of whom were to be appointed by each of the major party state chairmen. N.J. Const. (1947), Art. IV, § III, par. 1. They provided for appointment of an eleventh member by the Chief Justice if a deadlock ensued. Id., Art. IV, § III, par. 2. The Commission was directed to perform its work regularly after the publication of each decennial census. Id., Art. IV, § III, par. 3.
New district lines were drawn for the 1967 elections. However, our Supreme Court, in Jackman v. Bodine, 49 N.J. 406 (1967), invalidated the new provision that assemblymen always be allotted to each Senate district at a ratio of two per senator, at least as it applied to Passaic and Union Counties. The court also disapproved of the entire senatorial districting scheme in the most southerly portion of the State and ruled that the constitutional provision for election of senators singly by Assembly districts when the senatorial district consisted of more than one whole county applied to all such multi-member districts, not just those allotted only two senators, as specified in Art. IV, § II, par. 2 of the Constitution. The court took these actions to reduce population deviation among districts to the minimum indicated in continuing United States Supreme Court reapportionment decisions. See Swann v. Adams, 385 U.S. 440, 87 S.Ct. 569, 17 L.Ed.2d 501 (1967). The court further ordered the Apportionment Commission to draw new lines for the 1969 Assembly elections consistent with its decision.
*39 The next three reapportionment decisions emanated from this 1967 Jackman decision. In Jackman v. Bodine, 50 N.J. 127 (1967), the court approved the Commission's redrawing of district lines in the southern counties and ordered the odd assemblymen allotted to Passaic and Union Counties to run at large in the county rather than by Assembly district for that year's election. In Jackman v. Bodine, 53 N.J. 585 (1969), the court accepted the Commission's work for the 1969 Assembly elections, and in Jackman v. Bodine, 55 N.J. 371 (1970), the court approved the state constitutional scheme for the 1971 election of both houses.
Last year our Supreme Court once again considered the entire system of legislative representation in this State, however, and concluded that sweeping changes were necessary to insure that the legislative districts would conform to the increasingly rigid one-man, one vote principle as further developed by the federal Supreme Court. The court ordered that after 1973 all senators represent single-member districts and that two assemblymen be allotted to each of these districts. It further ordered the Apportionment Commission to draw these district lines without regard to county boundaries, paying attention only to substantial equality of population, municipal boundaries, contiguity and, to a limited extent, the constitutional requirement of compactness. See Scrimminger v. Sherwin, 60 N.J. 483 (1972).
In so ruling the Scrimminger court referred particularly to the federal Supreme Court decisions in Connor v. Williams, 404 U.S. 549, 92 S.Ct. 656, 30 L.Ed.2d 704 (1972); Whitcomb v. Chavis, 403 U.S. 124, 91 S.Ct. 1858, 29 L.Ed.2d 363 (1971), and Abate v. Mundt, 403 U.S. 182, 91 S.Ct. 1904, 29 L.Ed.2d 399 (1971). In Connor the court disapproved of a Mississippi legislative districting plan which contained a total variance of 18.9% between the largest and smallest Senate districts and 19.7% between the largest and smallest House districts. The court did not upset the plan, however, because the election had already been held. *40 In Whitcomb the Supreme Court affirmed a lower court's determination that an Indiana apportionment plan, although it followed a policy of adhering to county lines, was invalid because the total variance among Senate districts was 28.20% and among House districts, 24.78%. Our Supreme Court commented:
We read Whitcomb to mean that such deviations are invalid notwithstanding the stated purpose of the apportionment (i.e., to adhere to county lines), and even though that purpose could not be satisfied by another arrangement involving lesser deviations. * * * [Scrimminger v. Sherwin, supra, at 493 of 60 N.J.]
Abate involved county government. The court held that the need for flexibility, the desire to preserve the integrity of political subdivisions, and the limited number of representatives involved "lend support to the argument that slightly greater percentage deviations may be tolerable for local government apportionment schemes" than in the case of their state or national counterparts. 403 U.S., at 185 91 S.Ct. at 1907. The Abate court approved a total deviation of 11.9%. Our Supreme Court noted that
Abate leaves the reader with the conviction that the deviations it upheld are about the maximum permissible for county government, with something considerably less being the most that adherence to the lines of political subdivisions could justify in the case of a State legislature. [Scrimminger v. Sherwin, supra at 494 of 60 N.J.]
The Scrimminger court therefore concluded that the 28.83% deviation range among Senate districts and 26.20 deviation range among Assembly districts found in the Apportionment Commission plan for elections during the 1970's under the constitutional scheme which it had previously approved in the 1970 Jackman case was now invalid. The court said that it was satisfied that adherence to the state constitutional mandate to respect county lines could not be enforced, under the demographic pattern revealed by the 1970 census, consistently with what it understood to be *41 the permissible deviation from the one-man, one-vote ideal. 60 N.J. at 495.
Consequently, the court directed the Commission, in drawing the lines for the new districts, not to give any recognition to county lines, but to observe municipal lines if possible. It also directed the Commission to adhere to the constitutional mandate requiring contiguity as well as compactness to a limited extent. With respect to the latter requirement, the court said:
So also will the requirement for compactness, which may serve to justify a deviation or to curb the quest for partisan gain, although, as we have noted before, compactness may be of limited utility in the light of the odd configurations of our State and its municipalities. Jackman, 49 N.J. at 419. * * * [Scrimminger, supra, at 498 of 60 N.J.]
The Commission, in fashioning the plan now before us, sought to follow the Scrimminger directives as it understood them. The plan was certified within three weeks after the United States Supreme Court decision in Mahan v. Howell. Although it appears that the Commission was aware of the imminence of the Mahan decision and apparently delayed for a short period of time promulgation of its own plan, it took the position that the Scrimminger directives were unaffected by the Mahan decision.
We consider first whether the plan as devised comported with the directives given to the Commission by our Supreme Court in Scrimminger.
Examination of the plan reveals that it divides the State into 40 districts. Twenty-two of the districts lie wholly within a single county. In addition, four districts encompass a whole county or two counties within their boundaries. The boundaries of county lines are breached in the case of 14 of the 21 counties. Portions of both Burlington and Morris Counties lie within six different districts. In both cases five of such districts are shared with neighboring counties. Similar fragmentation, although to a lesser extent, *42 exists in the case of Monmouth, Middlesex, Ocean, Passaic and Union Counties.
The Commission followed the Scrimminger directive to use municipalities as building blocks, with necessary exceptions in the case of Newark and Jersey City. With one minor exception it also complied literally with the requirement of contiguity. That deviation was corrected by the trial court.
Examination of the map reveals a significant number of bizarrely shaped districts in approximately the "shoelace" and "horseshoe" configurations condemned in Jackman v. Bodine, 49 N.J. 406, 419 (1967). Two of these, Districts 24 and 25, are the subject of challenge in one of the present actions on the ground that they do not comport with the constitutional requirement of compactness. Each of these districts is more than 20 miles long and generally about three to four miles in width. District 24 has a common boundary for most of its length on the east with the western boundary of District 25. Each district includes municipalities in three different counties.
Although these two districts on their face seem to depart most radically from the concept of compactness, several others vie with them for that distinction. The affidavit submitted by the staff consultants in support of the plan states that the Commission followed the criteria prescribed by the Supreme Court in Scrimminger. However, it does not disclose how or to what extent the requirement of compactness was used. Inquiry at the oral argument developed that the Commission paid little or no attention to this requirement on the ground that it was incapable of a meaningful definition.
We note that Chief Justice Weintraub, in announcing the applicable criteria, indicated that the requirement of compactness "may be of limited utility in the light of the odd configurations of our State and its municipalities." However, that pronouncement cannot be read to mean that "compactness" can be ignored. In this connection, we note *43 also that the requirement appears in Art. IV, § II, par. 3 of the New Jersey Constitution as amended in 1966, which pertains to the drawing of Assembly districts: "The Assembly Districts shall be composed of contiguous territory, as nearly compact and equal in the number of their inhabitants as possible * * *."
Although the impact of the compactness directive cannot be precisely stated, we believe that the word itself can be given meaningful content. Webster's Third New International Dictionary (1966) defines "compact" as "marked by concentration in a limited area." Technically, we interpret the requirement of compactness to mean that between two districts of equal area the one with the smaller perimeter is the more compact. A somewhat similar idea was projected by counsel for the Apportionment Commission at the oral argument  that the objective of compactness could be determined by drawing a circle around each of the proposed districts. Those districts which occupy relatively greater areas within the circle could be said to be more compact. See People v. Swift, 270 Ill. 532, 110 N.E. 904, 905 (Sup. Ct. 1915).
We recognize that the constitutional mandate to draw districts equal in their number of inhabitants may conflict with the mandate for compactness and that the former is paramount. Compactness is undoubtedly a material factor, however, when the choice of districting plans includes one yielding bizarre designs. See Jackman v. Bodine, supra, 49 N.J. at 419. This is particularly so where compact districts may be drawn with a minimal increase in population deviation.
The evidence before us leads us to believe that the Commission can produce a plan with much more compact districts, and yet which is compatible with other constitutional criteria. Indeed, we note that one of the parties, on very short notice and without the aid of computer services, produced a plan which, at least on its face, represents a far greater compliance with the requirement of compactness *44 while still complying substantially with the equal population imperative.
We note also from the affidavits submitted by the Commission's consultants that it added other criteria than those set forth in Scrimminger:
The Commission chose to construct the new Senate districts generally conforming to the present Assembly districts, in order to reduce the number of combinations of building blocks (municipalities) and to provide desirable continuity in the democratic process of representation.
The affidavits then declared that "the maximum deviations in the certified plan are the result of the Commission's policy of recognizing the existing Assembly districts * * *."
Whether or not this may be said to be a euphemistic description of gerrymandering, albeit of a bipartisan nature, we need not determine. But we are satisfied that the Commission exceeded the scope of the mandate it received by attaching so great significance to political subdivision of such recent vintage. Although it may be permissible to consider such political and administrative factors after constitutional criteria have been satisfied, it is clearly improper to apply them at the expense of the mandatory guidelines.
We turn now to an even more complex and difficult problem. This concerns the impact of the recent decision in Mahan v. Howell, supra, on the existing state constitutional scheme for the appointment of state legislative seats as interpreted by our Supreme Court in Scrimminger. Mahan was decided on February 21, 1973. The Commission's certification is dated March 15, 1973.
Mahan involved the constitutionality of a reapportionment plan for the Virginia House of Delegates, which included districts which ranged in deviation from the ideal district by as much as 16.4% (or 23.6% by the dissenters' calculations). The plan was accepted by a 5-3 majority of the court because the deviations were the result of a consistent policy *45 of respecting county and city boundaries in drawing the district lines.
Prior to Mahan the trend of United States Supreme Court decisions such as Swann v. Adams, Connor v. Williams, Whitcomb v. Chavis, and Abate v. Mundt, supra, was toward a rule that states may deviate from an absolute equality of population among legislative districts only when necessary. See Mahan dissent, 410 U.S. 333, 93 S.Ct. at 989, 35 L.Ed.2d at 341. The Mahan opinion explicitly indicates a return to a standard previously articulated in Reynolds v. Sims, supra, that "so long as the divergencies from a strict population standard are based on legitimate considerations incident to the effectuation of a rational state policy, some deviations from the equal-population principle are constitutionally permissible * * *." 410 U.S. at 325, 93 S.Ct. at 985, 35 L.Ed.2d at 330. The Mahan court concluded that the policy of maintaining the integrity of political subdivision lines in the process of reapportioning a state legislature was a rational one and it quoted the following justification of it in Reynolds v. Sims, supra:
Several factors make more than insubstantial claims that a State can rationally consider according political subdivisions some independent representation in at least one body of the state legislature, as long as the basic standard of equality of population among districts is maintained. Local governmental entities are frequently charged with various responsibilities incident to the operation of state government. In many States much of the legislature's activity involves the enactment of so-called local legislation, directed only to the concerns of particular political subdivisions. And a State may legitimately desire to construct districts along political subdivision lines to deter the possibilities of gerrymandering. * * * [377 U.S. at 580-581, 81 S.Ct. at 1391]
Surely, "Legislators represent people not trees or acres." Reynolds v. Sims, supra at 562, 84 S.Ct. at 1382. But it must also be observed that legislators represent people as members of political groups as well as in their individual capacities. Social harmony often demands that groups of unequal strength in numbers be treated alike, or that certain *46 groups be given influence out of proportion to the size of their membership. Governments have repeatedly given recognition to this principle in both their formal structure and their process of making decisions.
The reasons for treating citizens of the same county as such a unified political group were well expressed by Chief Justice Weintraub in Jackman v. Bodine:
The citizens of each county have a community of interest by virtue of their common responsibility to provide for public needs and their investment in the plants and facilities established to that end. Anciently, and still today, the counties reflect different economic interests, although of course these economic interests are not perfectly contained or separated by any political line, municipal, county or State. So, certain counties have a dominant concern with manufacturing and commerce; others have a large stake in agriculture; still others lean heavily upon the resort industry; and finally a few counties have a special interest in the products of the sea. And of course there may be competing area interests in such matters as highways, taxation, and water supply. [43 N.J. at 462-463]
It has also been observed that in this State the county is the basic unit of political party organization. State of New Jersey, County and Municipal Government Study Commission, County Government  Challenge and Change, 74 (1969). We think that the value of treating citizens of the same county as members of a unified political group is conserved by placing as many districts as possible wholly within a county as well as it is by placing whole counties within a district.
Counteracting the principle that groups should often be given disproportionate weight is one which says that fundamental fairness demands that each citizen of the comprehensive political unit have roughly equal influence in determining matters of concern to all. We interpret the reapportionment decisions of the past decade to require that this latter principle weigh heavier in the balance but that the former principle be entitled to some consideration.
*47 In Scrimminger our Supreme Court rejected the Commission's plan which was constructed pursuant to N.J. Const. (1947), Art. IV, § II, par. 1:
Each Senate district shall be composed, wherever practicable, of one single county and, if not so practicable, of two or more contiguous, counties.
At the oral argument the Commission's counsel explained that in 1971 the Commission could have divided the State into Senate districts with much smaller population deviations, but it refrained from doing so because such districts would consist of more than three counties and in many cases would have a relatively large number of senators assigned to them. The reason given for this decision was that such districts would be unwieldy and would have many senators elected at large. Our reading of Art. IV, § II, par. 2, however, tells us that where several senators are assigned to a multi-county Senate district they must be elected in single-member Assembly districts in accordance with Art. IV, § II, par. 3, quoted above. Jackman v. Bodine, 49 N.J. 406, 416 (1967). If the Commission had proceeded on this thesis, it would have acted in harmony with the Scrimminger mandate for single-member districts and yet would have produced a plan in which as many districts as possible were made up of whole counties or districts lying entirely within a county.
The apportionment opinions of the courts of this State reveal a consistent desire to give significance to counties as units for representation. Scrimminger represents the first departure from this tradition in any way and followed a trend toward absolute exactness in constructing legislative districts. That trend has now been significantly modified.
We are uncertain as to precisely which portions of the state constitutional scheme were invalidated by Scrimminger. It is clear that the portion of Art. IV, § II, par. *48 3, which permits up to 40% population variation between districts does not comport with even the relaxed Mahan standard. Courts have been loath "to play the numbers games," but we see no alternative to discussion of mathematical limits.
Justice Rehnquist does not give the outer limit of permissible deviation in the Mahan opinion. But he does state that 16.4% "may well approach tolerable limits." 410 U.S. 315 at 329, 93 S.Ct. 979, 35 L.Ed.2d 320 (1973). The Supreme Court in Whitcomb, supra, struck down an apportionment of state legislative districts where the deviation was 24.78% although the plan respected county lines.
We are not required to determine where the line of demarcation is. However, in view of the great population disparities among our counties, and the odd configuration of our State, our rational state policy might conceivably mandate a permissible deviation less than 16.4%.
In construing the constitutionality of state constitutional provisions the traditional rule is that courts should seek to preserve their validity as far as possible. A construction nullifying a specific clause will not be given to a constitution unless absolutely required by the context. Marbury v. Madison, 5 U.S. (1 Cranch) 137, 2 L.Ed. 60 (1803).
So far as the present litigation is concerned, the question narrows down to whether county lines can be recognized to any degree in drawing legislative districts.
In Scrimminger the Supreme Court held that the mandate of our State Constitution with respect to adherence to county lines cannot be enforced under the demographic pattern revealed by the 1970 census. 60 N.J. at 495. But the federal constitutional setting in which the apportionment controversies in this State must be resolved has changed considerably since publication of the Scrimminger decision. It appears to us that the Mahan decision may now permit effectuation of our entire constitutional scheme for districting, with the exception of the permitted population deviations mentioned above.
*49 Our Supreme Court did not explicitly declare Art. IV, § II, of our Constitution to be invalid, although that may have been the practical effect of its decision that county lines should not be adhered to. Since our Supreme Court did not have the benefit of the new constitutional standard as enunciated in Mahan before it, we, of course, do not know whether its mandate to the Commission would have been the same. It is at least open to the argument that in the light of this State's strong tradition of treating counties as units of representation it would have concluded that county lines should be respected as far as possible. This is especially so in view of the fact that the State Constitution contains a mandate to do so. That court may well decide that the constitutional provision remains viable.
We think the Commission should provide the court with information from which it can be determined whether compliance therewith is possible within the parameters of permissible population deviation as expressed in Mahan. The Commission was unable to inform us whether this could be done. But, as we have already noted, one of the plaintiffs has produced a proposed alternative plan. We note that the affidavit attached to that plan states that maintenance of county units and maintenance of county lines as well as the other constitutional criteria were considered in its preparation. It also states that the range of deviation between high and low districts was 9.76%, a figure well under that found permissible in Mahan. At least superficially, it appears to adhere to the language of our Constitution as to the composition of legislative districts. It may well be that the Commission can develop a variety of plans meeting all of these objectives. The Commission would then be free to apply any other criteria within its field of expertise.
Under the circumstances and in view of the sparse record presented to us, we think the proper course is as follows: This court will not interfere with this year's primary and general elections and it directs that they proceed on the basis of the apportionment plan as amended by the court *50 below. This court will consider further argument as to whether the Commission should draw a new plan for the remaining legislative elections of this decade. To this end the Commission is directed to provide information to the court as to whether an apportionment plan can be formulated in accordance with N.J. Const. (1947), Art. IV, § II, within the deviation limits indicated by the Mahan decision. Our understanding is that with the aid of computer services this can readily be done. We believe that all the criteria  the primary goal of equal population, as well as contiguity, compactness and minimal transgression of county lines  can be translated into practical instructions for computer analysis. See O'Rourke, Reapportionment: Law, Politics, Computers (1972). If a number of plans satisfy all requirements, the Commission is directed to supply information as to all of them and to indicate which one or ones it would prefer if such criteria are ultimately deemed applicable.
In order to afford the Commission sufficient time to perform this task and in the meantime to permit any party desiring to apply for interlocutory review of these determinations, we fix September 10, 1973 as the date for the submission of the required data. At that time we will set a date for further argument unless the matter is otherwise disposed of.
So modified, the judgment appealed from is affirmed.