SYLLABUS

This syllabus is not part of the Court's opinion. It has been prepared by the Office of the Clerk for the convenience of the reader. It has been neither reviewed nor approved by the Court and may not summarize all portions of the opinion.

**Jersey City United Against the New Ward Map v. Jersey City Ward Commission**
**(A-10/11-24) (089292)**

**Argued January 6, 2025 -- Decided June 18, 2025**

**PATTERSON, J., writing for the Court.**

In this appeal, the Court considers challenges to the ward map adopted by defendant Jersey City Ward Commission following the 2020 federal census.

Jersey City is divided into wards for the purpose of the election or appointment of any municipal officers. Following the release of the 2020 census data, the Ward Commission determined that there was a 59% population deviation between the most populous ward, Ward E, and the least populous ward, Ward D. That deviation far exceeded the maximum population deviation authorized by the Municipal Ward Law (MWL), N.J.S.A. 40:44-9 to -18. The Commission disseminated and later approved a new map in which the population deviation between those wards was 1.8% and the boundaries of all six wards were revised.

Plaintiffs -- individuals and community organizations opposed to the Commission's map -- filed these actions to challenge the map. Plaintiffs argued that the new map failed to meet the MWL's compactness requirement, see N.J.S.A. 40:44-14, because its wards earned low scores on two mathematical measures of compactness, the Polsby-Popper Measure and the Reock Score. Second, the Community Organizations alleged that the Commission's map violated principles of equal protection guaranteed by the New Jersey Constitution, contending that the wards were not sufficiently compact and that the Commission unlawfully divided historic districts and established neighborhoods, thus diminishing the capacity of communities of interest to achieve effective representation for issues such as affordable housing and high-rise development. The Community Organizations also asserted a claim under the New Jersey Civil Rights Act (NJCRA), N.J.S.A. 10:6-1 to -2, predicated upon the alleged violations of the MWL and the State Constitution.

The trial court concluded that the Commission's ward map created wards that were sufficiently compact under the MWL and granted the Commission's motion to dismiss plaintiffs' statutory and constitutional claims. The Appellate Division reversed the dismissal of plaintiffs' MWL claims and remanded the matter to the

1

trial court for factfinding as to whether there was a rational basis for the Commission's determination that the wards defined by its map were sufficiently compact to satisfy the MWL's requirements. 478 N.J. Super. 132, 144-56 (App. Div. 2024). It affirmed the trial court's determinations of plaintiffs' equal protection and NJCRA claims. Id. at 151, 154-55. The Court granted certification, limited to the MWL, equal protection, and NJCRA claims. 258 N.J. 482 (2024).

**HELD:** The Commission's map represents a proper exercise of the substantial discretion the MWL grants to ward commissions to set the boundaries of municipal wards. The Court does not concur with the Appellate Division's ruling that additional factfinding is necessary to determine whether the Commission's map meets N.J.S.A. 40:44-14's compactness requirement. The Court reverses the Appellate Division's judgment on that claim and reinstates the trial court's judgment as to the Commission's compliance with the MWL without further proceedings. The Court's conclusion that the Commission complied with the MWL compels rejection of the equal protection claim. And, in light of its holding that the map did not violate either the MWL or the New Jersey Constitution, the Court affirms the Appellate Division's determination that the trial court properly dismissed the Community Organizations' NJCRA claim.

1. The Court reviews the requirements of the MWL, which charges a commission to "fix and determine the ward boundaries so that each ward is formed of compact and contiguous territory." NJ.S.A. 40:44-14. The statute also mandates that "[t]he population of the most populous ward so created shall not differ from the population of the least populous ward so created by more than [ten percent] of the mean population of the wards," using the census as "the population determinant." Ibid. The Legislature did not define a "compact" territory for purposes of the MWL, nor did it direct that ward commissions use a mathematical measure of compactness such as the Polsby-Popper Measure or the Reock Score in the determination of ward boundaries, even though they were available when the MWL was enacted. In short, the Legislature directed a ward commission to design wards that are compact, but did not prescribe a methodology for that determination or otherwise constrain a ward commission's discretion. (pp. 17-20)

2. Although the Court has not previously addressed the MWL's compactness requirement, it has addressed the New Jersey Constitution's legislative district compactness requirement. In Jackman v. Bodine, plaintiffs challenging a legislative redistricting map relied heavily on a claim of excessive population discrepancies. 49 N.J. 406, 418 (1967). The defendants asserted that although the districts envisioned in alternative maps proposed by the plaintiffs "would come somewhat closer to the optimum population size," redistricting officials had "selected arrangements which are more 'compact,'" and in some situations may have considered "other matters" such as "so-called community interests, partisan history,

2

and residence of incumbents." Ibid. Observing that those other matters "are wholly irrelevant" and could not be invoked to support population deviations "of any kind," the Court held that the constitutional mandate limiting population deviations can be a more important consideration than compactness where the districts are being created on the basis of existing political subdivisions, unless a configuration would yield such bizarre designs as a "shoe lace" or "horse shoe." Id. at 418-19. Both Jackman, ibid., and Davenport v. Apportionment Commission, 65 N.J. 125, 133-34 (1974), approve a commission's assessment of a legislative district's compactness by visual inspection of a map. (pp. 20-23)

3. Turning to plaintiffs' claims that the Commission's map fails to satisfy the MWL's compactness requirement, the Court first finds that the Commission was not required to utilize the Polsby-Popper Measure or Reock Score to assess compactness. The MWL does not mandate the use of those measures, and so a ward commission may elect to use them but is not required to do so. Similarly, although the preservation of communities of interest may be relevant to the work of ward commissions, it is not a requirement for determining compactness under the MWL. Finally, the Court does not concur with plaintiffs' contention that Wards A, D, and F are "bizarrely shaped" and thus violate the MWL. The contours of Wards A and D are principally determined not by the Commission, but by Jersey City's uneven borders with adjoining municipalities and natural features such as the Hudson and Hackensack Rivers. Ward F was significantly altered when the Commission reduced Ward E's population by nearly thirty percent to meet the MWL's population deviation requirement. Ward F has uneven borders, but it is not comparable to "bizarrely shaped" districts such as the "horseshoe" and "shoelace" configurations addressed in Jackman and Davenport. A deferential standard of review governs appeals of redistricting plans in which there is no claim of invidious discrimination, and the Court concludes, under that standard, that the Commission's plan meets N.J.S.A. 40:44-14's mandate of compactness. (pp. 23-29)

4. The Court reverses the Appellate Division's decision to remand for factfinding as to whether the ward commissioners had a rational basis for their determination of compactness because it finds the record to be adequate for appellate review. The Court disagrees with the dissent's suggestion that the Court is constrained to remand this matter because the Commission did not file a cross-petition. Finally, the Court shares the dissent's view that a detailed explanation of a ward commission's compactness determination would better inform the public and facilitate judicial review. The Legislature, however, has not mandated such an explanation in a process undertaken on a stringent timetable, and the Court declines to impose such a requirement in this appeal. (pp. 29-33)

5. The Court reviews the New Jersey Constitution's equal protection principles. Here, the Community Organizations assert no claim of invidious discrimination on

racial or other grounds. They do not allege that the Commission unconstitutionally treated one class of people differently from the manner in which it treated another class of people. Instead, they contend that the Commission improperly divided certain established neighborhoods and communities of interest into wards that were not compact. Accordingly, the Court's conclusion that the Commission complied with the MWL's compactness standard compels rejection of the Community Organizations' equal protection claim, and the Court affirms the judgment of the Appellate Division as to that claim. (pp. 34-36)

6. Finally, because an NJCRA claim depends on a deprivation "of any substantive . . . rights, privileges or immunities secured by the Constitution or laws of this State," see N.J.S.A. 10:6-2(c), and because the Court finds that no constitutional or statutory violation occurred here, the Court affirms the Appellate Division's determination that the trial court properly dismissed the Community Organizations' NJCRA claim. (pp. 36-38)

**AFFIRMED IN PART and REVERSED IN PART.**

**JUSTICE WAINER APTER, concurring in part and dissenting in part,** expresses the view that by dismissing the MWL claim outright, the Court is enlarging the Appellate Division's judgment in favor of the Commission without the Commission ever filing a cross petition or even requesting that relief. Justice Wainer Apter would affirm the Appellate Division's judgment as to the MWL claim on that basis alone and would also hold that a remand is justified on the merits of plaintiffs' MWL claim. Justice Wainer Apter would not apply the Appellate Division's rational basis test, finding that it lacks a basis in the MWL or case law; instead, the purpose of the remand would be to determine whether the new wards are compact within the meaning of the MWL. Justice Wainer Apter explains that where, as here, plaintiffs allege that the 2022 map is much less compact than the 2012 map pursuant to both mathematical measures and the eyeball test, and where, as here, the Commission has not explained why, the Commission should be required to redraw the map to meet the MWL's compactness requirement unless it can explain, on remand, why redrawing the wards to address the fifty-nine percent population deviation between Wards E and D required such a drastic decline in compactness for all six wards. Justice Wainer Apter agrees that the equal protection and NJCRA claims were properly dismissed and explains why that is so regardless of the outcome on the MWL claim.

**CHIEF JUSTICE RABNER and JUSTICES PIERRE-LOUIS and FASCIALE join in JUSTICE PATTERSON's opinion. JUSTICE WAINER APTER filed a separate opinion concurring in part and dissenting in part, in which JUSTICES NORIEGA and HOFFMAN join.**

4

SUPREME COURT OF NEW JERSEY

A-10/11 September Term 2024

089292

Jersey City United Against
the New Ward Map, Downtown
Coalition of Neighborhood
Associations, Greenville Neighborhood
Alliance, Friends of Berry Lane
Park, Riverview Neighborhood
Association, Pershing Field
Neighborhood Association, Sgt. Anthony
Neighborhood Assoc., Gardner
Avenue Block Association,
Lincoln Park Neighborhood Watch,
Morris Canal Redevelopment CDC,
Harmon Street Block Association,
Crescent Avenue Block
Association, Democratic
Political Alliance, and Frank E.
Gilmore, in his individual and
official capacity as Ward F
Councilman,

Plaintiffs-Appellants,

v.

Jersey City Ward Commission and
John Minella, in his official capacity as
Chair of the Commission,

Defendants-Respondents.

James Calderon,

Plaintiff-Appellant,

v.

City of Jersey City Ward
Commission, John Minella,
Chairman, Sean J. Gallagher,
Secretary, and Commissioners
Daniel E. Beckelman, Paul Castelli,
Janet Larwa, and Daniel Miqueli,

Defendants-Respondents.

On certification to the Superior Court,
Appellate Division, whose opinion is reported at
478 N.J. Super. 132 (App. Div. 2024).

| Argued | Decided |
|--------|---------|
| January 6, 2025 | June 18, 2025 |

Renée Steinhagen and Yael Bromberg argued the cause
for appellants Jersey City United Against the New Ward
Map, et al. (NJ Appleseed Public Interest Law Center,
Bromberg Law, and Matsikoudis & Fanciullo, attorneys;
Renée Steinhagen, Yael Bromberg, and William C.
Matsikoudis, on the briefs).

James Calderon, appellant, argued the cause on
appellant's behalf.

Jason F. Orlando argued the cause for respondents Jersey
City Ward Commission, et al. (Murphy Orlando,
attorneys; Jason F. Orlando, John W. Bartlett, Tyler
Newman, and Mallory B. Olwig, on the briefs).

Peter Slocum argued the cause for amicus curiae
American Civil Liberties Union of New Jersey
(Lowenstein Sandler, attorneys; Alexander Shalom, of
counsel, and Peter Slocum and Mikayla Berliner, on the
brief).

2

Bruce D. Greenberg argued the cause for amici curiae City of Jersey City and Councilman at Large Daniel Rivera (Lite DePalma Greenberg & Afanador, attorneys; Bruce D. Greenberg, on the brief).

Andrew Gimigliano submitted a brief on behalf of amicus curiae Electoral Innovation Lab (Mandelbaum Barrett, attorneys; Andrew Gimigliano and Brian Block, on the brief).

Edward D. Rogers submitted a brief on behalf of amicus curiae League of Women Voters of New Jersey (Ballard Spahr, attorneys; Edward D. Rogers and Elizabeth V. Wingfield, of counsel and on the brief).

Scott D. Salmon submitted a brief on behalf of amicus curiae New Jersey Association of Election Officials (Jardim Meisner Salmon Sprague & Susser, attorneys; Scott D. Salmon and Julia Burzynski, of counsel and on the brief).

Richard J. Allen, Jr. submitted a brief on behalf of amici curiae New Jersey League of Municipalities, New Jersey Association of Counties, and New Jersey Institute of Local Government Attorneys (Kipp & Allen, attorneys; Richard J. Allen, Jr., on the brief).

JUSTICE PATTERSON delivered the opinion of the Court.

In the Municipal Ward Law (MWL), the Legislature prescribed the method by which municipalities that have adopted a ward system for municipal elections establish the boundaries of their wards. N.J.S.A. 40:44-9 to -18. Following each federal decennial census, ward commissioners "fix and determine the ward boundaries so that each ward is formed of compact and

3

contiguous territory" and the population of the most populous ward does not diverge from the population of the least populous ward by more than ten percent of the mean population of the wards. N.J.S.A. 40:44-14.

In this appeal, we consider statutory and constitutional challenges to the ward map adopted by defendant Jersey City Ward Commission following the 2020 federal census. Plaintiffs, who are individuals and community organizations opposed to the Commission's map, sued the Commission and some of its members. They asserted, among other allegations, a statutory claim premised on the MWL's mandate that wards be "compact"; an equal protection claim under the New Jersey Constitution; and a claim pursuant to the New Jersey Civil Rights Act (NJCRA), N.J.S.A. 10:6-1 to -2.

The trial court concluded that the Commission's ward map created wards that were sufficiently compact under N.J.S.A. 40:44-14 and granted the Commission's motion to dismiss plaintiffs' statutory and constitutional claims pursuant to Rule 4:6-2. Plaintiffs appealed, and the Appellate Division affirmed in part and reversed in part the trial court's judgment. Jersey City United Against the New Ward Map v. Jersey City Ward Comm'n, 478 N.J. Super. 132, 144-56 (App. Div. 2024). It reversed the trial court's dismissal of plaintiffs' MWL claims and remanded the matter to the trial court for factfinding as to whether there was a rational basis for the Commission's

4

determination that the wards defined by its map were sufficiently compact to satisfy the MWL's requirements. Id. at 147-50. We granted plaintiffs' petition for certification, limited to plaintiffs' claims based on the MWL, equal protection principles, and the NJCRA.

We view the Commission's map to represent a proper exercise of the substantial discretion the MWL grants to ward commissions to set the boundaries of municipal wards. We do not concur with the Appellate Division's ruling that additional factfinding is necessary to determine whether the Commission's map meets N.J.S.A. 40:44-14's compactness requirement. Accordingly, we reverse the Appellate Division's determination with respect to the MWL. We affirm the Appellate Division's determination that the trial court properly dismissed plaintiffs' equal protection and NJCRA claims.

## I.

### A.

Jersey City is divided into wards "for the purpose of the election or appointment of any municipal officers." N.J.S.A. 40:44-10. In accordance with N.J.S.A. 40:44-11, the members of the Hudson County Board of Elections and the Jersey City municipal clerk were appointed as ward commissioners.

On September 16, 2021, Governor Philip D. Murphy announced the results of the 2020 census for New Jersey. At its initial meeting, the Ward

5

Commission determined that there was a fifty-nine percent population deviation between the most populous ward, Ward E, and the least populous ward, Ward D. That deviation far exceeded the maximum population deviation authorized by N.J.S.A. 40:44-14.

The Commission stated that it "sought to craft a map that would (1) impose the least amount of demographic change to each ward while (2) lowering the deviation between the most populous ward and the least populous to the lowest possible percentage." According to the Commission, it "utilized a proprietary mapping software which depicted the existing ward map featuring the census tracts provided by the [f]ederal government superimposed upon it."

The Commission disseminated a proposed new map and a comparison of the demographic breakdown of the 2012 ward map based on the 2012 census data and the 2022 proposed ward map based on the 2020 census data. It noted that in contrast to the fifty-nine percent population deviation between the most and least populous wards that would exist if the 2012 ward boundaries were retained following a decade of significant change, the population deviation between the most and least populous wards in its proposed map was only 1.8 percent. In the Commission's proposed new map, the boundaries of all six wards were revised.

6

At a public hearing, residents, public officials, and representatives of groups opposed to the new ward map presented comments. The Commission then adopted the map by a six-to-zero vote, with one commissioner abstaining. It published a report explaining its decision and identifying the new ward boundaries. The Commission found that the map conformed to N.J.S.A. 40:44-14's requirement that the ward boundaries be compact and contiguous, and that the population of the most and least populous wards not differ by more than ten percent. The map adopted by the Commission is depicted below.



B.

1.

This appeal arose from two actions in lieu of prerogative writs challenging the Commission's map.  The first was filed by pro se plaintiff James Calderon (Calderon), and the second was filed by thirteen community organizations and Ward F Councilman Frank E. Gilmore (collectively, Community Organizations).

Three of the claims asserted in the plaintiffs' complaints are before us in this appeal.[1]

First, plaintiffs in both actions asserted in their complaints that the Commission violated the MWL because the new wards were not sufficiently compact.  The Community Organizations alleged that the new map should be rejected because its wards earned low scores on two mathematical measures of

---

[1] In addition to the claims at issue in this appeal, the Community Organizations alleged that the Commission violated their right of free speech and their right of free association under Article I, Paragraphs 6 and 18 of the New Jersey Constitution; that the Commission violated the Open Public Meetings Act (OPMA), N.J.S.A. 10:4-6 to -21, by making decisions in private meetings; that the Commission retaliated against Councilman Gilmore for his campaign advocacy by removing his supporters from Ward F; and that the Commission violated the NJCRA based on those constitutional and statutory allegations.

8

compactness, the Polsby-Popper Measure and the Reock Score.[2]  They

proposed an alternative map, contending that it offered more compact wards as

assessed by those measures.

Second, the Community Organizations alleged in their complaint that the

Commission's map violated principles of equal protection guaranteed by

Article I, Paragraph 1 of the New Jersey Constitution.  The Community

Organizations did not assert that the Commission engaged in invidious

discrimination when it devised the new map.  Instead, they premised their

equal protection claim on the contention that the wards were not sufficiently

compact and that the Commission unlawfully divided historic districts and

established neighborhoods, thus diminishing the capacity of communities of

interest to achieve effective representation for issues such as affordable

housing and high-rise development.

Third, the Community Organizations alleged in their complaint that the

Commission violated the NJCRA by violating the MWL and equal protection

---

[2]  In their complaint, the Community Organizations explained that the Polsby-Popper Measure "looks at the ratio of the area of a district and compares it to the area of a circle whose circumference equals the perimeter of the district," with scores ranging between zero and one, and scores closer to one indicating a more compact district.  They asserted that the Reock Score "looks at the ratio of the area of the district and compares it to the area of the smallest (minimum bonding) circle that encloses the entire district's shape," with scores ranging between zero and one, and scores closer to one indicating a more compact district.

9

principles and therefore deprived them of their right to live in compact wards that preserved communities of interest.

Plaintiffs sought, among other relief, a declaration voiding the Commission's map and an order that the Commission redraw the map.

Pursuant to Rule 4:6-2(e), the Commission moved in both actions to dismiss the complaints for failure to state a claim. Plaintiffs opposed the motions.

The trial court dismissed both complaints with prejudice. Citing this Court's opinion in Davenport v. Apportionment Commission, 65 N.J. 125, 133-35 (1974), the court noted that judicial review of a plan such as the ward map is limited, that compactness is an elusive concept, and that a map should not be struck down simply because a judge concludes that a better map could be devised. The trial court acknowledged that a plan that created bizarrely shaped districts for partisan advantage would not be tolerated, but it found no such flaw in the Commission's map. The court accordingly rejected plaintiffs' MWL claims. It also dismissed the Community Organizations' equal protection claim, rejecting the notion that such a claim can be premised on the rights of citizens who share a common interest in a particular issue. Finally, the trial court dismissed the Community Organizations' NJCRA claim on the

10

ground that they failed to allege a claim that the Commission violated their substantive rights.[3]

## 2.

Plaintiffs appealed the trial court's judgments. The Appellate Division affirmed in part, reversed in part and remanded for limited factfinding. Jersey City United, 478 N.J. Super. at 155-56.

The Appellate Division observed that redistricting plans such as the ward map in dispute "are not subject to the normal arbitrary, capricious, and unreasonable standard generally used to evaluate agency actions." Id. at 149. It explained that "[i]nstead, courts are limited to determining whether the redistricting plan is 'unlawful or reflects invidious discrimination.'" Ibid. (quoting In re Establishment of Cong. Dists. by N.J. Redistricting Comm'n, 249 N.J. 561, 574 (2022)).

In the absence of any claim of invidious discrimination or partisan gerrymandering in this appeal, the Appellate Division held that the boundaries and map can be challenged only on the basis of N.J.S.A. 40:44-14's requirements of compactness, contiguousness, and population deviation, not on

---

[3] In addition to addressing the MWL, equal protection, and NJCRA issues that are relevant to this appeal, the trial court resolved standing and timeliness disputes and dismissed plaintiffs' OPMA, free speech and associational rights claims, as well as the NJCRA claim premised on those claims, pursuant to Rule 4:6-2(e).

grounds of "general, but undefined, concepts of 'communities of interest' or 'historic neighborhoods.'" Ibid.

As to the sole statutory factor at issue in plaintiffs' appeal, compactness, the appellate court reasoned that "[a] ward need not be as tight as possible, and the realities of geography will require some amount of elongation and jagged boundaries." Ibid. It held that "[a] ward need only have a rational basis for its shape, considered within the context of the shape of the overall municipality, the other wards, and the population deviation between the most populous and least populous wards." Id. at 149-50. The Appellate Division cautioned that courts "should not consider whether there is a better or more compact configuration." Id. at 150.

The Appellate Division remanded for a determination whether "the Commissioners had a rational basis for their configuration," so that the trial court could "then determine whether the wards are compact, given the flexibility afforded by the [MWL]." Ibid. The appellate court granted the trial court "discretion to allow focused cross-examination of one or more Commissioners . . . limited to the rational basis for the compactness of the wards." Ibid. It barred any challenge based on assertions that the Commission's "wards do not comply with other models of compactness" or that the Commission's map "breaks up communities of interest or

12

neighborhoods," and specifically rejected the Community Organizations' "attempt to use the Polsby-Popper Measure or the Reock Measure." Ibid.

The appellate court affirmed the trial court's dismissal of the Community Organizations' equal protection claim, noting the lack of any claim of invidious discrimination on account of race or any other basis, and the absence of any allegation identifying "how any class of people was treated differently by the Commission as compared to another class of people." Id. at 151. It also affirmed the trial court's dismissal of the Community Organizations' NJCRA claim because there was no viable claim of deprivation of a substantive right. Id. at 154-55 (citing N.J.S.A. 10:6-2(c)). The appellate court affirmed the dismissal of plaintiffs' remaining claims. Id. at 155.

C.

We granted plaintiffs' petitions for certification, "limited to the issues concerning the interpretation of the 'compactness' requirement of the [MWL]; the challenge under the Equal Protection Clause of the New Jersey Constitution; and the dismissal of the claim brought under the [NJCRA]." 258 N.J. 482 (2024). We granted the applications of the following organizations to appear as amici curiae: the American Civil Liberties Union of New Jersey (ACLU); the City of Jersey City and Councilman at Large Daniel Rivera, jointly represented (City); the Electoral Innovation Lab (EIL); the League of

Women Voters of New Jersey (LWV); the New Jersey Association of Election Officials (NJAEO); and the New Jersey League of Municipalities, New Jersey Association of Counties, and New Jersey Institute of Local Government Attorneys, jointly represented (NJLM).

II.

The Community Organizations state that the Commission's map created bizarrely shaped wards that are not compact as N.J.S.A. 40:44-14 requires, and that the map fails to preserve communities of interest, splits up historic neighborhoods, and ignores natural boundaries. They argue that the Appellate Division's limited remand is improper because it effectively eliminates the MWL's compactness requirement. The Community Organizations assert that the Commission violated the New Jersey Constitution's equal protection guarantee because it unnecessarily fractured established neighborhoods and communities of interest, thus diminishing residents' voting rights. They contend that they have a viable NJCRA claim based on substantive rights conferred by the MWL. Calderon asserts a statutory claim under the MWL, arguing that the Commission's map includes bizarrely shaped wards that are not compact and should not be tolerated.

The Commission argues that its map is entitled to a presumption of legality, that compactness is a vague concept less important than population

14

equality in designing a ward map, and that a map should not be invalidated because it splits a community of interest into different wards. According to the Commission, the Appellate Division properly affirmed the dismissal of the Community Organizations' equal protection claims in the absence of a violation of the MWL, a claim of racial discrimination, or evidence of voter dilution by virtue of the new map, and the Community Organizations' NJCRA claim fails because they demonstrated no deprivation of a substantive right.

The ACLU urges the Court to incorporate the preservation of communities of interest into the MWL's definition of "compact," and to reject the Appellate Division's "rational basis" test. The LWV argues that the Court should vacate the Appellate Division's limited remand and instead order full discovery and expert testimony regarding "the statistical measurements and evidence regarding communities of interest." The EIL takes no position on the outcome of this appeal but argues that we should require the Polsby-Popper Measure and the Reock Score as measures of compactness under the MWL.

The City argues that any requirement that the ward map preserve communities of interest not only contravenes N.J.S.A. 40:44-14, but could weaken the voting power of members of those communities. The NJAEO urges the Court to reject plaintiffs' contention that ward commissioners, who do not have access to detailed information about residents' demographic

15

qualities or views on particular issues, should be required to preserve communities of interest when they redraw a ward map. The NJLM asserts that the Court should apply the plain meaning of the word "compact" in the MWL without reference to the concept of communities of interest and leave policy determinations on that concept to the Legislature.

### III.

As we observed in the legislative redistricting setting of <u>Davenport</u>, "[r]eapportionment is essentially a political and legislative process." 65 N.J. at 135. We held that a redistricting plan "must be accorded a presumption of legality with judicial intervention warranted only if some positive showing of invidious discrimination or other constitutional deficiency is made." <u>Ibid.</u> Invoking the United States Supreme Court's observation that "[p]olitics and political considerations are inseparable from districting and apportionment," we observed that "[t]he judiciary is not justified in striking down a plan, otherwise valid, because a 'better' one, in its opinion, could be drawn." <u>Id.</u> at 134-35 (citing <u>Gaffney v. Cummings</u>, 412 U.S. 735, 753 (1973)); <u>accord</u> <u>Gonzalez v. N.J. Apportionment Comm'n</u>, 428 N.J. Super. 333, 368 (App. Div. 2012). As we recently noted, "[t]hat stringent standard still applies." <u>Establishment of Cong. Dists.</u>, 249 N.J. at 569. It is not our task to decide whether there is another map that would be fairer or better than the map at

issue, but to determine whether "the map selected is 'unlawful.'"  Ibid. (citing

N.J. Const. art II, § 2, ¶ 9.)

Here, we determine only whether the map adopted by the Commission

complies with the MWL's requirement of a "compact" map, whether it

contravenes the New Jersey Constitution's equal protection guarantee, and

whether it gives rise to a claim under the NJCRA.  Absent a violation of the

MWL, the equal protection guarantee, or the NJCRA, we must uphold the

Commission's map.  Ibid.

## A.

We begin with plaintiffs' claim that the Commission's map violates the

MWL because it created wards that were not "compact," contrary to N.J.S.A.

40:44-14.

## 1.

The Legislature enacted the MWL to provide "a uniform method for the

fixing and determination of municipal ward boundaries by ward

commissioners."  S. 3157 (1981).[4]  Effective on January 12, 1982, the MWL

---

[4]  The MWL's legislative history indicates that the Legislature considered the recommendations of the County and Municipal Government Study Commission, known as the "Musto Commission," which were set forth in a publication entitled Forms of Municipal Government in New Jersey.  See Sponsor's Statement to S. 3157 (L. 1981, c. 496).  The Legislature decided to implement only one of those recommendations -- that "the general law for re-

governs "any municipality having adopted a charter or form of government, or ordinance, providing that the municipality shall be divided into wards, or other similar representation districts, for the purpose of the election or appointment of any municipal officers." N.J.S.A. 40:44-10.

The Legislature provided that a ward commission shall consist of "[t]he members of the county board of elections of the county in which the municipality is located, together with the municipal clerk." N.J.S.A. 40:44-11.

Within three months of the Governor's promulgation of the results of a federal decennial census, the ward commission must hold a meeting to "make such adjustments in ward boundaries, as shall be necessary to conform them to the requirements" of the MWL. N.J.S.A. 40:44-13(c). Those requirements are set forth in N.J.S.A. 40:44-14, which charges a commission to "fix and determine the ward boundaries so that each ward is formed of compact and contiguous territory." The statute also mandates that "[t]he population of the most populous ward so created shall not differ from the population of the least populous ward so created by more than [ten percent] of the mean population of

---

drawing wards and the Optional Municipal Charter Law provisions for re-redrawing wards, be updated and consolidated into a single, uniform ward statute prior to the 1980 census." Cnty. & Mun. Gov't Study Comm'n, Forms of Municipal Government in New Jersey 57 (17th Report, Jan. 1979) (citing N.J.S.A. 40:44-1 to -8 and N.J.S.A. 40:69A-197 to -204, both of which were repealed by L. 1981, c. 496).

18

the wards," using the census as "the population determinant." N.J.S.A. 40:44-14. Within thirty days of its first meeting, the commission must file a report "setting forth and properly describing the ward boundaries fixed and determined," and must annex to that report "a map of the municipality with the ward boundaries clearly marked thereon." N.J.S.A. 40:44-15.

The Legislature did not define a "compact" territory for purposes of the MWL. See N.J.S.A. 40:44-14. Accordingly, we give that term its "generally accepted meaning, according to the approved usage of the language." N.J.S.A. 1:1-1. As dictionary definitions suggest, the term "compact" modifying the word "territory" in N.J.S.A. 40:44-14 denotes the geographic contours of a given ward. See Webster's Third International Dictionary 461 (unabridged) (2002) (defining "compact" to denote "[m]arked by concentration in a limited area"); Merriam-Webster's Collegiate Dictionary 252 (11th ed. 2020) (defining "compact" to denote "a dense structure or parts of units closely packed or joined" and "occupying a small volume by reason of efficient use of space").

Absent from the MWL is any legislative direction that ward commissions use a mathematical measure of compactness such as the Polsby-Popper Measure or the Reock Score in the determination of ward boundaries. See N.J.S.A. 40:44-14. That is particularly significant because mathematical

19

measures of compactness were available when the MWL was enacted; indeed, Dr. Ernest C. Reock, inventor of the Reock Score, was one of the two representatives of the Bureau of Government Research and Services who prepared the Musto Commission Report. Nor did the Legislature identify factors that a commission should consider in assessing a ward's compactness. See ibid. In short, the Legislature directed a ward commission to design wards that are compact, but did not prescribe a methodology for that determination or otherwise constrain a ward commission's discretion. See ibid.

Although we have not previously addressed the MWL's compactness requirement, we have twice addressed the New Jersey Constitution's legislative district compactness requirement.[5] In Jackman v. Bodine, plaintiffs challenging a legislative redistricting map relied heavily on a claim of excessive population discrepancies among the proposed districts as a ground to

---

[5] The New Jersey Constitution imposes a compactness requirement for the determination of General Assembly districts; such districts

> shall be composed of contiguous territory, as nearly compact and equal in the number of their inhabitants as possible, and in no event shall each such district contain less than eighty per cent nor more than one hundred twenty per cent of one-fortieth of the total number of inhabitants of the State as reported on the last preceding decennial census of the United States.

> [N.J. Const. art. IV, § 2, ¶ 3.]

strike down the plan. 49 N.J. 406, 418 (1967). The defendants asserted that although the districts envisioned in alternative maps proposed by the plaintiffs "would come somewhat closer to the optimum population size," redistricting officials had "selected arrangements which are more 'compact,'" and in some situations may have considered "other matters" such as "so-called community interests, partisan history, and residence of incumbents." Ibid.

Observing that those other matters "are wholly irrelevant" and could not be invoked to support population deviations "of any kind," the Court held that the constitutional mandate limiting population deviations is in some settings a more important consideration than compactness:

> Compactness usually appears in discussions of districting, and of course the constitutional amendments cited above refer to it. We incline to believe that the concept is substantially significant only when wholly new district lines are being created without reference to existing political subdivisions. Where the districts are being created on the basis of existing political subdivisions, it seems to us that compactness, although not irrelevant, becomes a much reduced factor. We do not think it possible to state the precise impact of compactness, but we believe it helpful for future guidance to suggest that population equality must be distinctly paramount. Compactness no doubt would be a material factor if the choice were between a configuration of existing political entities which would yield such bizarre designs as a "shoe lace" or "horse shoe." Absent such extremes, compactness may not be relied upon to justify an appreciable deviation.
>
> [Id. at 419.]

21

Although the Court did not define a "compact" district in <u>Jackman</u>, it suggested that redistricting officials' visual review of the physical shape or density of a district is an appropriate method of determining whether the constitutional mandate is met.  <u>See</u> <u>ibid.</u>[6]

In <u>Davenport</u>, plaintiffs challenging a legislative apportionment plan contended that some of the districts created by the plan were "of the 'shoestring' or 'horseshoe' type" that fail the constitutional requirement of compactness, and "that these odd-shaped districts were created solely for the purpose of protecting incumbent legislators."  65 N.J. at 133.  We observed that "[c]ompactness is an elusive concept" that "may be of limited utility in creating legislative districts in the light of the odd configurations of our State and its municipalities."  <u>Ibid.</u>  Citing <u>Jackman</u>, we reiterated "that population equality is distinctly paramount" to compactness, and that "where districts are created on the basis of existing political subdivisions, compactness becomes a

---

[6]  Several federal courts have referred to a visual review of a map to determine the compactness of districts as the "eyeball" test.  <u>See, e.g.</u>, <u>Alpha Phi Alpha Fraternity, Inc. v. Raffensperger</u>, 700 F. Supp. 3d 1136, 1257 (N.D. Ga. 2023) ("The eyeball test is commonly utilized to determine if a district is compact or not."); <u>Singleton v. Merrill</u>, 582 F. Supp. 3d 924, 1010 (N.D. Ala. 2022) (noting that an expert witness "testified that the 'most common' compactness metric is 'just eyeballing it as you draw the plan'"); <u>Lopez v. Abbott</u>, 339 F. Supp. 3d 589, 608 (S.D. Tex. 2018) (recognizing "the 'eyeball test' by which the Court may make a visual inspection of the map to determine whether the district is compact" and finding that the challenged maps passed that test).

much reduced factor."  Id. at 133-34.  We stated that "[w]hile the carving out of bizarrely shaped districts for partisan advantage will not be tolerated, the creation of balanced political districts serves a valid apportionment purpose." Id. at 134.

Our decisions in Jackman and Davenport thus approve a commission's assessment of a legislative district's compactness by visual inspection of a map.  Davenport, 65 N.J. at 133-34; Jackman, 49 N.J. at 418-19.  We stated that a district that is "bizarrely shaped," resembling, for example, a horseshoe or a shoelace, may not meet the constitutional mandate of compactness. Davenport, 65 N.J. at 133-34.  We also recognized that in legislative redistricting, achieving approximate population equality among wards is a critical consideration.  Ibid.; Jackman, 49 N.J. at 418-19.

2.

Against that backdrop, we address plaintiffs' claims that the Commission's map fails to satisfy the MWL's requirement that each ward be "formed of compact . . . territory."  N.J.S.A. 40:44-14.

Plaintiffs premise their compactness argument on three primary contentions:  (1) that the Commission did not properly assess the compactness of its proposed wards because it did not apply a mathematical measure such as the Polsby-Popper Measure or the Reock Score to those wards; (2) that the

23

Commission improperly excluded from its consideration of compactness the impact of its map on communities of interest; and (3) that Wards A, D, and F, like the "horseshoe"- and "shoelace"-shaped wards discussed in Jackman and Davenport, are bizarrely shaped and therefore not "compact" under N.J.S.A. 40:44-14.

We concur with the Appellate Division that the Commission was not required to utilize the Polsby-Popper Measure or the Reock Score to quantitatively assess the compactness of proposed wards. See Jersey City United, 478 N.J. Super. at 150. The Legislature did not define a "compact" ward as one earning a particular score on the Polsby-Popper Measure or the Reock Score, or otherwise tether the compactness requirement to a mathematical benchmark. See N.J.S.A. 40:44-14.[7] We do not add to a statute

---

[7] There is no consensus in the courts of our sister states regarding the role of mathematical measures in assessing compactness. Some state high court decisions have approved the use of such measures as one potential method of determining compactness. See, e.g., In re Senate Joint Resol. of Legis. Apportionment 100, 334 So. 3d 1282, 1287 (Fla. 2022) (stating that compactness can be evaluated both visually and by employing standard mathematical measurements); Pearson v. Koster, 367 S.W.3d 36, 49 & n.10 (Mo. 2012) (explaining that an article admitted into evidence stated that "there is no threshold level that can be shown by statistics" but noting "[t]hat does not mean that [statistical] measures are completely irrelevant but rather that they alone do not demonstrate that a map is or is not compact"); Carter v. Chapman, 270 A.3d 444, 464 n.23 (Pa. 2022) (relying on mathematical measures in evaluating compactness of proposed congressional districts). Other decisions have emphasized the limitations of such measures in assessing compactness. See, e.g., Vesilind v. Va.

24

requirements that the Legislature clearly has chosen not to include. See <u>Keim v. Above All Termite & Pest Control</u>, 256 N.J. 47, 62 (2023) ("We cannot 'write in an additional qualification which the Legislature pointedly omitted in drafting its own enactment . . . .'" (omission in original) (quoting <u>Craster v. Bd. of Comm'rs of Newark</u>, 9 N.J. 225, 230 (1952))); <u>State v. Fleischman</u>, 189 N.J. 539, 545 (2007) ("[W]e do not 'rewrite a plainly-written enactment of the Legislature [or] presume that the Legislature intended something other than that expressed by way of the plain language.'" (second alteration in original) (quoting <u>O'Connell v. State</u>, 171 N.J. 484, 488 (2005))); <u>Lippman v. Ethicon, Inc.</u>, 222 N.J. 362, 388 (2015) (noting that "courts should not rewrite plainly worded statutes" or "engraft requirements" that the Legislature did not include).

Therefore, we consider the determination whether to use mathematical measures to assess compactness to be within the broad discretion that the Legislature granted to ward commissions in the MWL. If a ward commission decides that such measures may assist it in a determination of ward

---

<u>State Bd. of Elections</u>, 813 S.E.2d 739, 750-51 (Va. 2018) (noting the lack of any "accepted bright-line test or score in the social sciences for when a district can no longer be considered 'compact'"); <u>In re Legis. Districting of State</u>, 475 A.2d 428, 443 (Md. 1982) (stating that "a mathematical formulation for determining whether a particular district is unconstitutionally noncompact was not within the contemplation of the constitutional framers").

25

boundaries, it may elect to use them, but it is not required to do so. In this case, it was within the Commission's discretion to decline to utilize the Polsby-Popper Measure and the Reock Score.

The Commission also acted within its discretion when it did not consider the map's impact on communities of interest as part of its inquiry about compactness. To be sure, the preservation of communities of interest is a traditional factor in redistricting. See Rucho v. Common Cause, 588 U.S. 684, 706 (2019) (identifying "keeping communities of interest together" among "'traditional' districting criteria"); Gonzalez, 428 N.J. Super. at 342-43, 369 (noting a redistricting commission's focus on "valid redistricting factors" that included "social, cultural, ethnic, and economic communities of interest"). During the 2022 deliberations of the New Jersey Legislative Apportionment Commission, the Honorable Philip Carchman (Ret.), the Commission's tiebreaking member, listed communities of interest as a factor distinct from the constitutional mandate of compactness in legislative redistricting. See Commission Meeting 2-8 (Jan. 8, 2022), https://www. apportionmentcommission.org/schedule.asp (last visited May 12, 2025).[8]

---

[8] Judge Carchman defined "communities of interest" to include "neighborhoods, communities, or groups of people who share common values, goals, and concerns -- such as cultural, ethnic, linguistic, economic, or religious interests, or shared infrastructure concerns, shared environmental

26

Judge Carchman viewed communities of interest, along with other standards "not constitutionally mandated" in legislative redistricting, to "allow for some discretion in their application." Ibid.

Although the preservation of communities of interest may be relevant to the work of ward commissions, it is not a requirement for determining compactness under the MWL. See N.J.S.A. 44:40-14. There is no authority in the MWL, its legislative history, or our case law for plaintiffs' argument that when it required wards to be "compact," the Legislature mandated that the members of a community of interest must vote in the same ward.[9] Ward commissions have the discretion to consider the impact of a ward's boundaries on communities of interest, but if they do so, the preservation of those communities should be weighed as a separate factor, not as a component of

concerns, or shared industry," but not connections based on "political considerations, such as partisan affiliations or loyalty to a particular incumbent." Ibid.

[9] In support of their allegation that the Legislature mandated consideration of communities of interest in the determination of ward boundaries in large municipalities, the Community Organizations invoke the Musto Commission's observation that "wards generally are not authorized by the Legislature for very small communities, the assumptions being that the rationale in favor of wards becomes weaker in a small municipality, and that wards would fragment the community unnecessarily." Forms of Municipal Government in New Jersey, at 57. That comment by the Musto Commission, not cited by the Legislature as a basis for the MWL, does not address N.J.S.A. 40:44-14's compactness requirement, but relates only to the question whether a given municipality should be divided into wards. It is irrelevant to our inquiry.

compactness.  Accordingly, the Commission did not violate N.J.S.A. 40:44-14 by not analyzing the impact of its map on communities of interest.

Nor do we concur with plaintiffs' contention that Wards A, D, and F are "bizarrely shaped" and thus violate the MWL.  The contours of Wards A and D are principally determined not by the Commission, but by Jersey City's uneven borders with adjoining municipalities and natural features such as the Hudson and Hackensack Rivers.  The boundaries that separate Ward A from Wards B and F are not linear, but neither are they "bizarre."  The same is true of the boundaries that separate Ward D from Wards C and E.  Ward F was significantly altered when the Commission reduced Ward E's population by nearly thirty percent to meet the MWL's population deviation requirement.  It now extends east from Jersey City's center to encompass a portion of the City's Hudson River waterfront.  Ward F has uneven borders, but it is not comparable to "bizarrely shaped" districts such as the "horseshoe" and "shoelace" configurations addressed in Jackman and Davenport.

It is, no doubt, possible to envision a ward map in which any of Jersey City's wards would be more compact than they appear in the Commission's redistricting plan.  Our inquiry, however, is not whether a court could design a better map than the map that the Commission devised.  Establishment of Cong. Dists., 249 N.J. at 569; Davenport, 65 N.J. at 135.  It is instead whether the

28

wards created by the Commission consist of "compact . . . territory" as the MWL requires, taking into account the mandate that the Commission eliminate the serious population deviation that had developed over the past decade and other relevant considerations.  See N.J.S.A. 40:44-14; Davenport, 65 N.J. at 134-35; Jackman, 49 N.J. at 418-19.

Applying the deferential standard of review that governs appeals of redistricting plans in which there is no claim of invidious discrimination, we conclude that the Commission's plan meets N.J.S.A. 40:44-14's mandate of compactness.  We respectfully disagree with the Appellate Division's ruling that the matter should be remanded to the trial court for factfinding as to whether the ward commissioners had a rational basis for their determination of compactness.  See Jersey City United, 478 N.J. Super. at 150.  We view the record to be adequate for appellate review without inquiry into the commissioners' individual views on the question of compactness.

The dissent agrees with our holding that the MWL's compactness requirement is not "a mandate to keep together 'communities of interest,'" post at ___ (slip op. at 4), and that the MWL does not require the Commission to achieve compactness as measured by a particular numerical cutoff, or to prioritize compactness over other MWL requirements, but does require the

29

Commission to consider and incorporate compactness in its determination, post at ___ (slip op. at 10-11, 18-19).

The dissent identifies two primary points of disagreement with our decision. First, the dissent contends that we must remand this matter to the trial court, rather than reinstate the dismissal of the MWL claim, because the Commission did not challenge the Appellate Division's remand in a cross-petition. Post at ___ (slip op. at 13-15). Second, the dissent states that the Commission's determination is inadequate because it did not indicate "whether or how" it considered compactness, and that the Commission should be required on remand to explain in detail the basis for its determination on that issue. Post at ___ (slip op. at 18). We briefly address each argument.

With respect to the MWL, the Appellate Division reversed the trial court's decision granting the Commission's motion to dismiss pursuant to Rule 4:6-2(e). The Appellate Division imposed a new standard not set forth in the MWL: whether the Commission "had a rational basis for the ward boundaries and map it adopted." See Jersey City United, 478 N.J. Super. at 155. Because the Appellate Division found the record insufficient to decide whether the Commission had such a rational basis for its compactness determination, it ordered a limited remand for the trial court to apply that test. Although we do not concur with the Appellate Division that a rational basis test should govern

30

the Commission's determination of compactness under N.J.S.A. 40:44-14, we find nothing procedurally improper about the Appellate Division's imposition of a remedy not requested by any party.  See ibid.

In plaintiffs' petitions for certification, they asked this Court to review and reverse the Appellate Division's judgment on the MWL claim; indeed, in their reply brief in support of their petition for certification, plaintiffs not only challenged the Appellate Division's judgment on the MWL issue, but specifically asserted that "the Appellate Division's limited remand must be reversed."

This Court's grant of certification placed the Appellate Division's judgment on the MWL's compactness requirement squarely in issue.  See Township of West Orange v. 769 Associates, 198 N.J. 529, 546 (2009) (noting that "if an issue is squarely presented, relief need not be withheld simply because it would inure to the benefit of a non-appealing party"); Hayes v. Delamotte, 231 N.J. 383, 386-87 (2018) ("[I]t is well-settled that appeals are taken from orders and judgments and not from opinions, oral decisions, informal written decisions, or reasons given for the ultimate conclusion." (quoting Do-Wop Corp. v. City of Rahway, 168 N.J. 191, 199 (2001))).

Here, the Court determines whether the Appellate Division properly reversed the trial court's determination and ordered a limited remand for

31

rational basis review. As explained supra at ___ (slip op. at 24-29), we find the wards devised by the Commission to be compact, we decline to adopt the Appellate Division's rational basis test, and we reverse the Appellate Division's judgment with respect to the MWL claim.

The fact that the Commission did not file a cross-petition does not constrain us to impose a remedy at odds with our decision on the merits; to the contrary, the Court's remedy must be consistent with its application of N.J.S.A. 40:44-14 to the Commission's map. Accordingly, the appropriate remedy is not to remand the matter for a determination under the Appellate Division's rational basis test, but to reinstate the trial court's dismissal of the MWL claim.

Indeed, the dissent itself rejects the Appellate Division's remand for a rational basis review, which it views to lack any basis in the MWL or prior case law. Post at ___ (slip op. at 18). The dissent would instead order a remand "to determine whether the new wards are compact within the meaning of the MWL." Post at ___ (slip op. at 18). Although we do not view any remand to be warranted on the merits, it is clear that the Commission's failure to file a cross-petition would not preclude imposition of the remedy that the dissent advocates: a remand, but one that diverges from the remand that the Appellate Division directed.

Accordingly, we respectfully disagree with the dissent's suggestion that the Court is constrained to remand this matter, rather than reinstate the trial court's judgment dismissing the MWL claim, because the Commission did not file a cross-petition.  See post at ___ (slip op. at 12-15).

With respect to the adequacy of the Commission's compactness finding, it is clear that the Commission met the MWL's procedural requirements.  It timely filed a report "setting forth and properly describing the ward boundaries fixed and determined," and made findings on all of N.J.S.A. 40:44-14's factors, including a finding that that the ward boundaries were compact.  The MWL requires nothing more.  See N.J.S.A. 44:40-1 to -18.  Nonetheless, the Commission's report also identified the statutory factor that drove the analysis: the urgent need to eliminate the fifty-nine percent population deviation between Ward E and Ward D, and reduce that deviation to the extent possible -- indeed, to a remarkably low 1.5 percent.  That factor provides context for the significant changes to the wards between the 2012 and 2022 maps.

We share the dissent's view that a detailed explanation of a ward commission's compactness determination would better inform the public and facilitate judicial review.  The Legislature, however, has not mandated such an explanation in a process undertaken on a stringent timetable.  See N.J.S.A. 44:4-13, -15, -16.  We decline to impose such a requirement in this appeal.

33

Accordingly, we reinstate the trial court's judgment as to the Commission's compliance with N.J.S.A. 40:44-14 without further proceedings.

B.

We next consider the Community Organizations' equal protection claim, based on the New Jersey Constitution.

Equal protection principles are "implicit in Art. I, par. 1 of the 1947 New Jersey Constitution." McKenney v. Byrne, 82 N.J. 304, 316 (1980). That provision states that "[a]ll persons are by nature free and independent, and have certain natural and unalienable rights, among which are those of enjoying and defending life and liberty, of acquiring, possessing, and protecting property, and of pursuing and obtaining safety and happiness." N.J. Const. art. I, ¶ 1. Like the Fourteenth Amendment of the Federal Constitution, the State Constitution's equal protection guarantee protects "against the unequal treatment of those who should be treated alike." Greenberg v. Kimmelman, 99 N.J. 552, 568 (1985); accord Lewis v. Harris, 188 N.J. 415, 442 (2006); Caviglia v. Royal Tours of Am., 178 N.J. 460, 472 (2004).

As this Court noted in Brady v. New Jersey Redistricting Commission, in which the plaintiffs claimed that they had been deprived of a voice in the redistricting process, the equal protection guarantee "protects against discriminatory governmental classifications of persons not related to some

34

appropriate state interest." 131 N.J. 594, 610-11 (1992). There, because the plaintiffs "failed to point to any classification at all that excluded them from participation," their equal protection challenge failed. Ibid. And in Gonzalez, the Appellate Division similarly rejected a federal equal protection claim to state legislative redistricting premised on alleged dilution of the voting rights of South Jersey voters. 428 N.J. Super. at 366. The appellate court found the trial court's consideration of the issue persuasive, including the holding that "no constitutional infirmity arose from 'the mere fact that a particular apportionment scheme makes it more difficult for a particular group . . . to elect the representatives of its choice.'" Id. at 368 (omission in original) (quoting Davis v. Bandemer, 478 U.S. 109, 131 (1986)). It concurred with the trial court's observation that the South Jersey districts included urban, suburban and rural areas, as well as "Democrats, Republicans, third-party voters, . . . unaffiliated voters," and "a variety of socioeconomic classes and races." Id. at 366. Like the trial court, the Appellate Division determined that the plaintiffs had not "alleged sufficient facts to demonstrate there is any type of invidious discrimination to disadvantage" South Jersey communities "that would offend Equal Protection principles." Ibid.

Here, the Community Organizations assert no claim of invidious discrimination on racial or other grounds. As the Appellate Division observed,

35

the Community Organizations failed to allege that the Commission unconstitutionally treated one class of people differently from the manner in which it treated another class of people. See Jersey City United, 478 N.J. at 151-52. Instead, they contend that the Commission improperly divided certain established neighborhoods and communities of interest into wards that were not compact. Accordingly, our conclusion that the Commission complied with the MWL's compactness standard compels rejection of the Community Organizations' equal protection claim.

We therefore affirm the Appellate Division's judgment with respect to the Community Organizations' equal protection claim.

C.

Finally, we address the Community Organizations' NJCRA claim.

Pursuant to the NJCRA, "[a]ny person who has been deprived of any substantive . . . rights, privileges or immunities secured by the Constitution or laws of this State . . . by a person acting under color of law" may bring an action for damages. N.J.S.A. 10:6-2(c); see also Winberry Realty P'ship v. Borough of Rutherford, 247 N.J. 165, 183-84 (2021) (reviewing the elements of an NJCRA claim). When an NJCRA claim is premised on a violation of a statute such as the MWL, we first determine whether the statute was violated and then decide whether the right at issue is a substantive right under the

36

NJCRA.  See N.J.S.A. 10:6-2(c); Tumpson v. Farina, 218 N.J. 450, 472-73 (2014).

To determine whether the Legislature intended to confer a substantive right on an individual when it enacted a given statute, we apply the standard prescribed by the United States Supreme Court in Blessing v. Freestone, 520 U.S. 329, 340-41 (1997).  Tumpson, 218 N.J. at 476 (adopting the standard). We have noted that under the Blessing standard, "[a] plaintiff must show that (1) Congress intended the statute to 'benefit the plaintiff'; (2) 'the right assertedly protected by the statute is not so "vague and amorphous" that its enforcement would strain judicial competence'; and (3) 'the statute must unambiguously impose a binding obligation on the States.'"  Id. at 475 (quoting Blessing, 520 U.S. at 340-41).  We also concluded that "[i]n accord with the Blessing test, even if we find that a statute confers a right, we still must determine whether the Legislature did not intend remedies of our Civil Rights Act to supplant those of other statutes."  Id. at 476.

Here, the Community Organizations allege that the Commission deprived them of their "substantive rights of equal treatment guaranteeing them fair representation in the ward boundaries" and "their substantive rights to reside in a ward that consists of compact territory that preserves their communities of interest" pursuant to the MWL and the New Jersey

37

Constitution's equal protection guarantee. They also allege that the Commission deprived them of their "substantive rights of equal protection to reside in a ward whose boundaries are drawn free from arbitrary, irrational, inconsistently applied, and/or impermissible considerations."

In light of our holding that the Commission's map did not violate either N.J.S.A. 40:44-14 or the New Jersey Constitution's equal protection guarantee, we affirm the Appellate Division's determination that the trial court properly dismissed the Community Organizations' NJCRA claim. See Jersey City United, 478 N.J. Super. at 154-55. We do not reach the question whether a violation of the MWL could give rise to an NJCRA claim under the Blessing test.

IV.

We affirm in part and reverse in part the judgment of the Appellate Division and reinstate the trial court's judgment dismissing with prejudice plaintiffs' complaints in accordance with Rule 4:6-2(e).


CHIEF JUSTICE RABNER and JUSTICES PIERRE-LOUIS and FASCIALE join in JUSTICE PATTERSON's opinion. JUSTICE WAINER APTER filed a separate opinion concurring in part and dissenting in part, in which JUSTICES NORIEGA and HOFFMAN join.

Jersey City United Against
the New Ward Map, Downtown
Coalition of Neighborhood
Associations, Greenville Neighborhood
Alliance, Friends of Berry Lane
Park, Riverview Neighborhood
Association, Pershing Field
Neighborhood Association, Sgt. Anthony
Neighborhood Assoc., Gardner
Avenue Block Association,
Lincoln Park Neighborhood Watch,
Morris Canal Redevelopment CDC,
Harmon Street Block Association,
Crescent Avenue Block
Association, Democratic
Political Alliance, and Frank E.
Gilmore, in his individual and
official capacity as Ward F
Councilman,

Plaintiffs-Appellants,

v.

Jersey City Ward Commission and
John Minella, in his official capacity as
Chair of the Commission,

Defendants-Respondents.

James Calderon,

Plaintiff-Appellant,

v.

City of Jersey City Ward

Commission, John Minella,
Chairman, Sean J. Gallagher,
Secretary, and Commissioners
Daniel E. Beckelman, Paul Castelli,
Janet Larwa, and Daniel Miqueli,

Defendants-Respondents.

JUSTICE WAINER APTER, concurring in part and dissenting in part.

The municipal wards adopted by the Jersey City Ward Commission in 2022 are significantly less compact than the wards that had been in place since 2012. Considering only the wards' geographic shapes, plaintiffs demonstrated a substantial decline in compactness using both mathematical measures and a simple visual inspection. All agree that the Municipal Ward Law (MWL) requires ward commissioners to "fix and determine the ward boundaries so that each ward is formed of compact and contiguous territory." N.J.S.A. 40:44-14. Plaintiffs allege that the Commission violated this statutory requirement. The trial court dismissed plaintiffs' MWL claim, but the Appellate Division reversed that dismissal and remanded for limited factfinding on whether the wards are compact within the meaning of the MWL. I agree with the Appellate Division that plaintiffs alleged sufficient facts to survive a motion to dismiss their MWL claim. I would, however, modify the Appellate Division's remand order. I therefore respectfully concur in part and dissent in part.

2

# I.

As the majority correctly notes, our redistricting precedents limit judicial review to whether a map conforms with constitutional and statutory requirements:  we must uphold a map absent an affirmative showing that it is "unlawful or reflects invidious discrimination."  In re Establishment of Cong. Dists. by N.J. Redistricting Comm'n, 249 N.J. 561, 574 (2022); ante at ___ (slip op. at 11, 17).  In assessing whether a constitutional or statutory violation has been shown, we do not ask whether a "fairer" or "better" map could have been drawn.  Establishment of Cong. Dists., 249 N.J. at 569.

Yet the MWL plainly instructs that municipal ward commissioners "shall fix and determine the ward boundaries so that each ward is formed of compact and contiguous territory."  N.J.S.A. 40:44-14.  In addition, the difference in population between the most populous and least populous ward must be no more than ten percent of the mean population of the wards.  Ibid.

Therefore, although the scope of judicial review is limited, in reviewing a claim for a violation of the MWL, a court must assess whether the wards are compact, contiguous, and compliant with population constraints.  Because, in my view, the majority diminishes the compactness requirement, I respectfully dissent from the majority's resolution of plaintiffs' MWL claim.

A.

As an initial matter, I agree with the majority that there is no basis in the text or structure of the MWL to read into the prescription that "each ward is formed of compact and contiguous territory," N.J.S.A. 40:44-14, a mandate to keep together "communities of interest." Ante at ___ (slip op. at 27-28).

Ward commissions must act quickly to redraw ward boundaries: they must meet within three months of the Governor's receipt of each federal decennial census and file a new map within thirty days of that meeting. N.J.S.A. 40:44-13(c), -15(a). And the statute provides limited tools to accomplish that task, allowing commissions to hire "a surveyor or engineer and such other assistants as shall be necessary to aid them in the discharge of their duties." Id. at -12. Within this framework, a commission has no practical ability to discern, consider, and actualize "general, but undefined, concepts of 'communities of interest.'" Jersey City United Against the New Ward Map v. Jersey City Ward Comm'n, 478 N.J. Super. 132, 149 (App. Div. 2024).

I also concur with the majority and the New Jersey League of Municipalities that it is up to the Legislature, not this Court, to make policy determinations regarding the benefits of keeping together "communities of interest." Ante at ___ (slip op. at 16, 28). The Legislature provided no such

4

mandate in the MWL.  See N.J.S.A. 40:44-9 to -18.  I therefore agree with the majority that the Commission was not required to "consider the map's impact on communities of interest as part of its inquiry about compactness."  Ante at ___ (slip op. at 26).

B.

The majority is likewise correct that compactness refers to "the geographic contours of a given ward," ante at ___ (slip op. at 19), or the geographic density of the "territory" within each ward, N.J.S.A. 40:44-14.

The Appellate Division in Davenport v. Apportionment Commission defined "compactness to mean that between two districts of equal area the one with the smaller perimeter is the more compact."  124 N.J. Super. 30, 43 (App. Div. 1973).  Here, the Appellate Division used -- and the majority approves -- a dictionary definition of compact as "having a dense structure or parts or units closely packed or joined" and "occupying a small volume by reason of efficient use of space."  478 N.J. Super. at 148 (quoting Merriam-Webster's Collegiate Dictionary 252 (11th ed. 2020)); ante at ___ (slip op. at 19).  The majority adds an additional definition:  "[m]arked by concentration in a limited area."  Ante at ___ (slip op. at 19) (quoting Webster's Third International Dictionary 461 (unabridged) (2002)).  These definitions give appropriate weight and content to the compactness requirement.  See also Acker v. Love,

5

496 P.2d 75, 76 (Colo. 1972) (defining compactness as "concern[ing] a geographic area whose boundaries are as nearly equidistant as possible from the geographic center of the area being considered").

C.

Yet respectfully, after setting forth these definitions, the majority devalues them. The majority quotes Jackman v. Bodine, 49 N.J. 406, 419 (1967), and Davenport v. Apportionment Commission, 65 N.J. 125, 133-34 (1974), for the proposition that compactness is "an elusive concept" and a "much reduced factor" that "may be of limited utility in creating legislative districts" and, in the majority's view, municipal wards as well. Ante at __ (slip op. at 22-23). In my view, a correct reading of those opinions, and the constitutional provisions they interpret, reveals that although compactness "may be of limited utility in creating legislative districts in the light of the odd configurations of [New Jersey] and its municipalities," Davenport, 65 N.J. at 133, no similar constraint applies to ward boundaries under the MWL. It is therefore incumbent upon us to apply the Legislature's compactness requirement in this case.

Our Constitution provides that "no county or municipality shall be divided among Assembly districts unless it shall contain more than one-fortieth of the total number of inhabitants of the State." N.J. Const. art. IV,

6

§ 2, ¶ 3.  Whereas the constitutional requirement to keep counties together was struck down in Scrimminger v. Sherwin, 60 N.J. 483, 495-97 (1972), and Davenport, 65 N.J. at 132-33, in furtherance of the Federal Constitution's one-person-one-vote principle, the constitutional requirement to keep municipalities together, unless the population of the municipality exceeds "one-fortieth of the total number of inhabitants of the State," remains.  N.J. Const. art. IV, § 2, ¶ 3; see N.J. Legis. Comm'n, Meeting Transcript for Jan. 8, 2022 4 (statement by the Hon. Philip S. Carchman), accessible via https:// www.apportionmentcommission.org/schedule.asp ("With the exception of Newark and Jersey City, whose populations exceed that of a single legislative district, municipalities cannot be split among districts.").

It is because municipalities are the "building blocks" of state legislative districts, Scrimminger, 60 N.J. at 498, and municipalities are themselves often "odd[ly] configur[ed]," Davenport, 65 N.J. at 133, that we have acknowledged that compactness may be an "elusive concept" when it comes to legislative redistricting, ibid.  See Jackman, 49 N.J. at 419 ("Where the districts are being created on the basis of existing political subdivisions, it seems to us that compactness, although not irrelevant, becomes a much reduced factor." (emphasis added)); Davenport, 65 N.J. at 133 ("Compactness . . . may be of

7

limited utility in creating <u>legislative districts</u> in the light of the odd configurations of our State <u>and its municipalities</u>." (emphases added)).

The same cannot be said for municipal wards. Unlike the Constitution, the MWL does not require that wards be drawn around any existing political subdivisions; indeed, there are no political subdivisions smaller than a municipal ward from which the wards could be built. <u>See</u> N.J.S.A. 40:44-14. The "odd configurations of our State and its municipalities" are therefore irrelevant to whether municipal wards can be drawn compactly under the MWL, aside from any portion of a ward boundary that tracks the outer boundary of the municipality itself. <u>Davenport</u>, 65 N.J. at 133. In other words, the fact that compactness is less feasible in the context of legislative districts, which must be built around municipalities, does not give ward commissions license to disregard the unambiguous compactness requirement in the MWL.

Significantly, as the majority notes, the MWL was enacted in 1981, <u>ante</u> at ___ (slip op. at 17), several years after this Court's 1967 decision in <u>Jackman</u> and 1974 decision in <u>Davenport</u>. The Legislature is presumed to be "familiar with existing case law." <u>State v. McCray</u>, 243 N.J. 196, 217 (2020) (quoting <u>Great Atl. & Pac. Tea Co. v. Borough of Point Pleasant</u>, 137 N.J. 136, 148 (1994)). If, based on the statements in <u>Jackman</u> and <u>Davenport</u>, the

8

Legislature viewed compactness as "an elusive concept" that would be "of limited utility" in drawing municipal ward boundaries, it would not have written it into the MWL without reservation or qualification.

As earlier noted, the MWL contains only three substantive restrictions on how ward boundaries can be drawn: "The ward commissioners shall fix and determine the ward boundaries so that each ward is formed of [1] compact and [2] contiguous territory," and "[3] [t]he population of the most populous ward so created shall not differ from the population of the least populous ward so created by more than 10% of the mean population of the wards." N.J.S.A. 40:44-14. The Legislature chose to include all three; we must respect that choice. Middletown Twp. PBA Local 124 v. Township of Middleton, 193 N.J. 1, 12 (2007) ("A court has no power to substitute its own idea of what a statute should provide in the face of clear and unambiguous statutory requirements." (quotation omitted)). To give effect to the text of the MWL, ward commissions therefore must draw wards to be compact and contiguous and to fall within the population-deviation limits.

D.

The Appellate Division "expressly reject[ed] . . . plaintiffs' attempt to use the Polsby-Popper Measure or the Reock Measure" to show that the 2022 wards were not compact. Jersey City United, 478 N.J. Super. at 150. The

9

majority likewise states that "it was within the Commission's discretion to decline to utilize the Polsby-Popper Measure and the Reock Score." Ante at ___ (slip op. at 26).

I would hold that in alleging a claim for a violation of the MWL based on non-compactness, plaintiffs may rely on mathematical measures such as the Reock and Polsby-Popper scores. Both are common methods of calculating compactness. Both grade district shapes on a scale of 0 to 1, with 0 being non-compact and 1 being perfectly compact. Both can usefully compare wards and give an idea of a ward's relative compactness. And both relate to the Appellate Division's description of a compactness measure in Davenport as "drawing a circle around each of the proposed districts" to evaluate which "occupy relatively greater areas within the circle." 124 N.J. Super. at 43. Indeed, courts in many jurisdictions rely upon the Reock and Polsby-Popper scores in analyzing compactness and non-compactness. See, e.g., In re Senate Joint Resol. of Legis. Apportionment 100, 334 So. 3d 1282, 1287 (Fla. 2022); Pearson v. Koster, 367 S.W.3d 36, 55-56 (Mo. 2012); Alpha Phi Alpha Fraternity, Inc. v. Raffensperger, 700 F. Supp. 3d 1136, 1197-99 (N.D. Ga. 2023), appeal docketed, No. 23-13914 (11th Cir. Nov. 28, 2023).

Although I would not adopt a particular numerical cutoff beneath which a ward is not compact, I would hold that mathematical measures can help a

10

plaintiff state a claim that a ward is not compact, or is materially less compact than it previously was, in violation of the MWL. Mathematical measures are not dispositive, but dismal compactness scores can help a plaintiff survive a motion to dismiss.

E.

Finally, I would hold that to state a claim for a violation of the compactness requirement of the MWL, a plaintiff may not allege that a ward map drawn many years ago, and unchanged since, is not compact. This is so because wards can permissibly be drawn to preserve continuity from prior maps. See Davenport, 65 N.J. at 134-35 ("Providing protection of incumbents serves a valid purpose and is a relevant factor to be taken into account in creating a legislative districting plan."). If a ward appears visually non-compact, but its shape was preserved from one census cycle to the next, plaintiffs should not be able to force the old map to be redrawn.

However, if a ward commission draws a new ward map that is substantially less compact than the previous map, that change could suggest that the commission did not adequately consider compactness or inappropriately subordinated it to extra-statutory considerations. If the commission could not explain how a substantial decline in compactness was

11

necessary to meet other MWL requirements, it would be obligated to redraw the ward boundaries to meet the MWL's compactness requirement.

## II.

In this case, I would hold that plaintiffs alleged sufficient facts to survive the motion to dismiss their MWL claim pursuant to Rule 4:6-2(e). I therefore agree with the Appellate Division that the MWL claim should not have been dismissed. I would, however, modify the Appellate Division's remand order to expand the scope of the remand.

## A.

Before explaining why plaintiffs alleged sufficient facts to survive a motion to dismiss, I would uphold the Appellate Division's reversal of the trial court's dismissal of plaintiffs' MWL claim because the Commission did not file a cross-petition for certification and did not challenge the Appellate Division's MWL holding at all.

As the majority notes, the trial court dismissed all of plaintiffs' claims. Ante at ___ (slip op. at 10). The Appellate Division affirmed the dismissal of all claims except the MWL claim, reversed that dismissal, and remanded the MWL claim for limited factfinding. Jersey City United, 478 N.J. Super. at 149-55.

Plaintiffs filed a petition for certification, asking this Court to grant review and reverse the dismissal of their non-MWL claims. As for the MWL claim, plaintiffs requested that we broaden the scope of the Appellate Division's remand order, arguing that it "render[ed] the claim and the [MWL] statute meaningless."

The Commission did not file a cross-petition for certification objecting to the Appellate Division's remand order. In fact, the Commission did not quarrel with the Appellate Division's revival of plaintiffs' MWL claim at all. Instead, the Commission argued that the MWL remand had already been scheduled and should be allowed to proceed. According to the Commission, "whether [plaintiffs] -- or, for that matter, the Commission -- may ultimately have grounds for appeal and certification remains to be seen."

"[A]ppeals are taken from judgments, not opinions, and, without having filed a cross-appeal, a respondent can argue any point on the appeal to sustain the [lower] court's judgment." State v. Watson, 254 N.J. 558, 609 (2023) (quoting Chimes v. Oritani Motor Hotel, Inc., 195 N.J. Super. 435, 443 (App. Div. 1984)). But if a respondent "is seeking to expand the substantive relief granted by the [lower] court, as opposed to merely arguing an additional legal ground to sustain the [lower] court's judgment, the [respondent] must file a

13

cross-appeal." State v. Eldakroury, 439 N.J. Super. 304, 307 n.2 (App. Div. 2015) (citing Jennings v. Stephens, 574 U.S. 271, 276 (2015)).

In addition, if a respondent does not argue that the judgment below should be altered, any such argument is waived. See Watson, 254 N.J. at 609 ("[A] respondent who is merely seeking to maintain his judgment may brief and argue on the appeal any points that will sustain his judgment and if he does not brief and argue such points he will be taken to have waived them." (quoting State v. Lefante, 14 N.J. 584, 589-90 (1954))).

Here, by dismissing the MWL claim outright, this Court is enlarging the Appellate Division's judgment in favor of the Respondent Commission without the Commission filing a cross petition or ever even requesting that relief. I would affirm the Appellate Division's judgment as to the MWL claim on that basis alone.

### B.

I would also hold that a remand is justified on the merits of plaintiffs' MWL claim.

In reviewing a motion to dismiss for failure to state a claim upon which relief can be granted, courts must "assume the facts as asserted by plaintiff[s] are true and give [them] the benefit of all inferences that may be drawn in [their] favor." Velantzas v. Colgate-Palmolive Co., 109 N.J. 189, 192 (1988).

14

"At [such a] preliminary stage of the litigation the Court is not concerned with the ability of plaintiffs to prove the allegation contained in the complaint." Printing Mart-Morristown v. Sharp Elecs. Corp., 116 N.J. 739, 746 (1989).

Applying that generous standard, I would hold that plaintiffs stated a claim for violation of the MWL. In their complaint, the Community Organizations provided compactness scores indicating that the new wards are significantly less compact than were the wards that existed under the 2012 map.[1] They alleged that using the Polsby-Popper measure, the 2022 map received an average score of 0.4006, with Ward F scoring 0.2089 and Ward D scoring 0.2576. By comparison, the Community Organizations stated that the previous ward map received an average Polsby-Popper score of 0.5368, with Ward F scoring 0.4848 and Ward D scoring 0.5328. Thus all wards, in the aggregate, are less compact, and Wards F and D are less than one-half as compact as they had been.

The Community Organizations also alleged that using the Reock score, the 2022 map averaged 0.3447, with Ward F scoring 0.1604 and Ward D

---

[1] As earlier noted, the majority states that "it was within the Commission's discretion to decline to utilize the Polsby-Popper Measure and the Reock Score." Ante at ___ (slip op. at 26). But the Community Organizations did not allege that the Commission was required to use these scores; instead, they submitted the scores to demonstrate that the wards the Commission drew are not compact, especially as compared to their previous iterations.

15

scoring 0.2753. This was compared to an average Reock score of 0.5019 for the 2012 map, with Ward F scoring 0.4998 and Ward D scoring 0.5133. The 2022 scores were thus "significantly lower" than the 2012 scores, demonstrating a significant decline in compactness between the 2012 and 2022 maps.

Even under an "eyeball test," see ante at ___ n.6 (slip op. at 22 n.6), the wards created in the 2022 map look substantially less compact than the wards that existed in 2012.[2]



_____

[2] The image plaintiffs submitted (reproduced here) labels the map created in 2012 as the "2010 Ward Map" because it was created using data from the 2010 census. We refer to it as the "2012 map" throughout.

According to the majority, "[t]he contours of Wards A and D are principally determined not by the Commission, but by Jersey City's uneven borders with adjoining municipalities and natural features such as the Hudson and Hackensack Rivers." Ante at ___ (slip op. at 28). But the significant decrease in the compactness of Wards A and D between 2012 and 2022 cannot be attributed to the borders of Jersey City with the Hudson River to the east, the Hackensack River to the west, or adjoining municipalities to the north or south. Ibid. Instead, the boundaries of Wards A and D that are significantly less compact in the 2022 map than they were in 2012 are where they meet other Jersey City wards: where Ward A meets B and F, and where Ward D meets C and E. Rather than simply tracking the outer borders of the city, the 2022 map creates new jagged borders within the city itself.

In addition, as plaintiffs identify, Ward F transformed from a relatively square shape to a jagged sideways L-shape. Wards A and D became many-sided shapes that defy easy description, with numerous appendages that make them less compact than they were previously. And the boundaries between wards went from generally smooth straight or curved lines to uneven routes filled with twists and turns. This is especially true of the boundaries between Wards F and A, F and E, D and C, and D and E.

17

Plaintiffs correctly submit -- and the relevant mathematical analysis supports -- that the wards' compactness substantially declined since the prior map.  And the Commission did not explain why that is so.  Indeed, the Commission did not explain how it considered compactness at all.  As the majority notes, the Commission's report states that it "sought to craft a map that would (1) impose the least amount of demographic change to each ward while (2) lowering the deviation between the most populous ward and the least populous to the lowest possible percentage."  Ante at ___ (slip op. at 6).  Absent from the report is any statement of whether or how the Commission considered compactness, beyond listing compactness as a requirement in the MWL.  Therefore, plaintiffs pleaded sufficient facts to allege that the Commission did not comply with the MWL's express compactness requirement, and their MWL claim should not have been dismissed.

C.

For these reasons, I would leave in place the Appellate Division's remand for further factfinding, but enlarge it slightly, as plaintiffs request.  As an initial matter, I would not apply the Appellate Division's rational basis test.  The MWL provides no basis for a rational basis test, see N.J.S.A. 40:44-9 to -18, and the Appellate Division did not ground the test in our prior case law.

18

Instead, the purpose of the remand would be to determine whether the new wards are compact within the meaning of the MWL. Appropriate evidence could include mathematical and geographic measures of compactness as well as examination of the Commissioners. At the very least, plaintiffs should be permitted to question the Commissioners as to whether and how they considered compactness in drawing the new map.

If on remand the Commission explained that the reduction in compactness was necessary to achieve the MWL's population requirements, and a ward's odd shape was due to the location of a high-rise apartment building that needed to be shifted between wards to ensure that requirement was met, the map would satisfy the MWL. This is because the MWL does not mandate a particular level of compactness. N.J.S.A. 40:44-12 to -15. As earlier noted, it provides for an expedited process with limited resources. Ibid. Ward commissioners are tasked with balancing multiple, possibly conflicting, factors. Ibid. They are not required to prioritize compactness over the other MWL requirements. See id. at -14. But if the Commission did not consider compactness, or deprioritized compactness for a nefarious or extra-statutory purpose, then the Commission would be required to re-draw the map to comply with the MWL.

Contrary to the majority's suggestion, remanding for a fact-finding hearing on whether the wards are compact within the meaning of the MWL would not add any procedural requirements to the statute. See ante at ___ (slip op. at 33). It would simply apply the MWL's compactness requirement as written. Where, as here, plaintiffs allege that the 2022 map is much less compact than the 2012 map pursuant to both mathematical measures and the eyeball test, and where, as here, the Commission has not explained why, the Commission should be required to redraw the map to meet the MWL's compactness requirement unless it can explain, on remand, why redrawing the wards to address the fifty-nine percent population deviation between Wards E and D required such a drastic decline in compactness for all six wards.

III.

I agree with the majority that plaintiffs' remaining claims were properly dismissed. Ante at ___ (slip op. at 35-39). I write briefly to explain why that is so regardless of the outcome on the MWL claim.

First, our State Constitution's equal protection guarantee protects "against the unequal treatment of those who should be treated alike." Greenberg v. Kimmelman, 99 N.J. 552, 568 (1985); accord Lewis v. Harris, 188 N.J. 415, 442 (2006); Caviglia v. Royal Tours of Am., 178 N.J. 460, 472 (2004). As the majority notes, ante at ___ (slip op. at 34-36), our courts have

20

rejected equal protection challenges absent some "discriminatory governmental classification." Brady v. N.J. Redistricting Comm'n, 131 N.J. 594, 610-11 (1992); accord Gonzalez v. N.J. Apportionment Comm'n, 428 N.J. Super. 333, 366, 369 (App. Div. 2012).

Here, plaintiffs did not allege invidious discrimination based on race or any other protected characteristic. Instead, they claim that some residents were denied the right to reside in compact wards that preserve communities of interest and therefore allow them to exert equal electoral power. As discussed above, communities of interest are not part of the MWL's compactness requirement. And even if the Commission violated the MWL's compactness requirement, plaintiffs failed to allege any specific facts to show that the Commission intentionally discriminated against them or made any classification of similarly situated Jersey City residents in drawing the new ward map. I therefore would affirm the Appellate Division's holding that plaintiffs failed to allege that the Commission unconstitutionally treated one class of people differently from another. See ante at ___ (slip op. at 35-36); Jersey City United, 478 N.J. at 151-52.

Second, plaintiffs' New Jersey Civil Rights Act (NJCRA) claim was properly dismissed because, even if the MWL was violated, it does not create individual rights that can be vindicated through a lawsuit for money damages.

21

As the majority explains, ante at ___ (slip op. at 36-37), to bring a cause of action under the NJCRA for money damages, N.J.S.A. 10:6-2(c), the statute allegedly violated must confer substantive individual rights on plaintiffs, Tumpson v. Farina, 218 N.J. 450, 472 (2014). "A plaintiff must show that [the Legislature] intended the statute to 'benefit the plaintiff.'" Tumpson, 218 N.J. at 475-76 (quoting Blessing v. Freestone, 520 U.S. 329, 340 (1997), and adopting Blessing's federal law test for NJCRA claims). "For a statute to create such private rights," its text must generally "be 'phrased in terms of the persons benefited.'" Gonzaga Univ. v. Doe, 536 U.S. 273, 284 (2002) (quoting Cannon v. Univ. of Chi., 441 U.S. 677, 692 n.13 (1979)).

When we have found statutes to confer substantive rights on individuals that can be enforced through a claim for money damages under the NJCRA, the statutes have contemplated those individuals within their plain text. See Harz v. Borough of Spring Lake, 234 N.J. 317, 321 (2018) (statute "specifically provide[d] that '[a]ppeals to the board of adjustment may be taken by any interested party affected by any decision of an administrative officer'" (second alteration in original) (quoting N.J.S.A. 40:55D-72(a))); Tumpson, 218 N.J. at 478 (statute prescribed that "[t]he voters shall . . . have the power of referendum" (alteration in original) (quoting N.J.S.A. 40:69A-185)). Unlike the statutes in Harz and Tumpson, the MWL does not mention

22

individuals, such as voters or ward residents, at all.  <u>See</u> N.J.S.A. 40:44-9 to -18.  It simply specifies what ward commissions must do.  <u>Ibid.</u>  A violation of the MWL therefore cannot give rise to an individual claim for money damages under the NJCRA.

IV.

Because plaintiffs sufficiently alleged a violation of the MWL's compactness requirement to survive a motion to dismiss, I would affirm the Appellate Division's remand as modified.  I therefore respectfully concur in part and dissent in part.